UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA          :

                                  :   **Docket No. 18 CR 834-8 (PAE)**

      v.                              :

                                  :

AARON YOUNG,                      :

           Defendant.          :

_____


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
AARON YOUNG'S MOTION FOR SENTENCE
REDUCTION AND HOME CONFINEMENT**


ALESSANDRA DeBLASIO
Attorney At Law
299 Broadway, Suite 1803
New York, NY  10007
(212) 321-7084

Attorney for Defendant Aaron Young

## TABLE OF CONTENTS

Preliminary Statement……………………………………………………………1

I.     Background…………………………………………………………...2

II.    Applicable Law………………………………………………………..3

   A.    Motions for Reduction of Sentence ................................................................. 3

   B.    Compassionate Release in the Time of COVID-19 ................................... 5

III.   Facts and Analysis……………………………………………………8

   A.    Exhaustion of Administrative Remedies ...................................................... 8

   B.    Extraordinary and Compelling Reasons for Immediate Release .............. 9

      1.   Serious Crisis in Aaron Young's Health Post-Sentencing.................... 9

      2.   Neglect and Negligence at Four BOP Facilities ................................. 14

          a.   At MCC – Failure to Test, Detect, and Diagnose.......................... 17

          b.   At MDC – Ongoing Failure to Test, Detect, and Diagnose ........ 19

          c.   At FCI Ray Brook – Failure to Adequately Treat........................... 20

          d.   At FCI Hazelton – Inadequate Treatment Due to COVID-19 .. 24

             i.    Administration of Insulins:  Outdated and Mistimed ....... 28

             ii.   Lack of Prescribed Diabetic Snacks ..................................... 32

             iii.  Self-Examination and Self-Care Impossible........................ 33

             iv.  Unsafe Distribution of Medication....................................... 37

             v.   Access to Care Limited ............................................................ 39

             vi.  Need to Be Placed in a Care 3 Facility ................................ 40

      3.   Detention and Incarceration in the Time of COVID-19................... 41

      4.   Intervening Changes in the Law of the Case Render Mr. Young's
          Sentence Disparate and Unjust................................................................ 46

          a.   Aaron Young and Aljermiah Mack:  Virtually Identical Charges
             and PSR Guidelines Ranges ................................................................. 50

          b.   Aaron Young and Aljermiah Mack:  Heroin-Fentanyl Findings . 52

          c.   Base Offense Level:  Heroin Not Fentanyl Analogue.................. 53

          d.   Four-Point Enhancement Not Applicable as a Matter of Law ... 57

          e.   Re-Calculating Mr. Young's Guidelines Range............................... 61

i

C.    18 U.S.C. § 3553(a) Factors Support a Sentence Reduction ................... 64

    1. The Characteristics of the Defendant Are Remarkably Altered ........ 65

    2. Mr. Young Has Served a Sufficient Percentage of His Sentence to Satisfy the Public's Interest in Punishment and Deterrence ............... 66

    3. The Nature and Circumstances of the Offense – Reconsidered in Light of Kristian Cruz's Trial Testimony – Support a Finding that Mr. Young Will Neither Recidivate Nor Endanger the Public .......... 68

    4. The Sentence Imposed Is Not Needed to Provide Mr. Young with Needed Medical Care or Other Prison Services .................................... 92

    5. The Court Shall Consider the Need to Avoid Unwarranted Sentence Disparities .............................................................................................. 93

    6. Section 3553(a) Factors Favor Immediate Release ............................... 93

Conclusion ....................................................................................................................... 94

## PRELIMINARY STATEMENT

Defendant Aaron Young comes now before this Court, by and through his attorney, Alessandra DeBlasio, to seek his release from Federal Correctional Institution ("FCI") Hazelton, to serve his three-year term of supervised release in home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in light of the risk that the COVID-19 pandemic presents to his health.

Assembled considerations provide extraordinary and compelling reasons justifying Mr. Young's early release, among them the heightened vulnerability to COVID-19 that Mr. Young faces due to his significant and serious medical conditions, and the unexpectedly punishing quality of the 41 months that he has spent in custody, most of it during the unprecedented pandemic – including the first six months of the pandemic at MDC-Brooklyn, and then at FCI Ray Brook where he went temporarily blind on account of medical neglect in failing to detect and diagnose diabetes.

The 18 U.S.C. § 3553(a) factors viewed in combination *from the vantage point of today* are consistent with his prompt release from FCI Hazelton with his ensuing term of supervised release served in home confinement.   The conditions of confinement, including bouts of legal blindness, have amounted to punishment harsher than ever imagined at the time of imposing punishment, and Mr. Young presents no threat to the public if immediately released.   Sound reasons exist to

1

believe that Mr. Young, who is now disabled and whose criminal history before the instant offense comprised solely 5th and 7th degree misdemeanor drug possession offenses – and whose single act of violent conduct in the course of this conspiracy was an aberration – will abide by the law when on supervised release subject to the strict conditions of home confinement.

Mr. Young's case accords with the other cases where this Court granted compassionate release during this extraordinary time to prisoners with demonstrated heightened vulnerability to COVID-19 and, accordingly, we ask this Court to grant Mr. Young's motion for compassionate release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

## I.    Background

Aaron Young was arrested on December 19, 2018.  He has been detained since that date (about 41 months).  On April 19, 2019, Mr. Young pled guilty pursuant to a plea agreement to Count One of a sixth superseding indictment, which charged him with racketeering conspiracy under 18 U.S.C. § 1962(d).  On December 2, 2019, this Court sentenced him to 240 months of incarceration and three years of supervised release.

Mr. Young appealed his sentence, at which stage the U.S. Court of Appeals for the Second Circuit appointed undersigned counsel to represent him under the Criminal Justice Act ("CJA").  The Court of Appeals dismissed the appeal without

2

reaching the merits on account of a plea agreement appeal waiver.  On January 26, 2022, this Court appointed undersigned counsel under the CJA to assist him in pursuing the instant motion.

## II.   Applicable Law

### A. Motions for Reduction of Sentence

Under 18 U.S.C. § 3582(c)(1)(A), "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," a court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  *United States v. Phillibert*, _ F. Supp. 3d _, No. 15 Cr. 647 (PAE), 2021 WL 3855894, at *2 (S.D.N.Y. Aug. 27, 2021) (citing § 3582(c)(1)(A)).  The court must also consider the "factors set forth in section 3553(a) to the extent that they are applicable." *Id.*

The defendant bears the burden of proving that he is entitled to compassionate release under 18 U.S.C. § 3582(c).  *Id.* (citations omitted).

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings, and instead required the BOP to seek such release on their behalf.  *Phillibert*, 2021 WL 3855894, at *2.  However, with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow

defendants independently to seek compassionate release relief from federal courts. *Id.*

Congress tasked the Sentencing Commission with identifying circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *Id.* (citing *United States v. Ebbers*, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020); 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary, which among other things (1) define various circumstances that present extraordinary and compelling reasons justifying release; and (2) require that a defendant not be a danger to the community. U.S.S.G. § 1B1.13(1)-(3) & cmt. n.1(A)-(D)); *Philibert*, 2021 WL 3855894, at *2.

However, the Commission has not updated that provision to reflect the First Step Act's amendment to § 3582(c)(1)(A), and its guidance refers only to a "motion of the Director of the Bureau of Prisons." *Id.* Accordingly, the Second Circuit has held that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *Id.* at *3 (citing *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020)).

Consistent with *Brooker*, in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons, or its freestanding requirement that the

defendant seeking release not pose any danger to the community.  Rather, the Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Phillibert*, 2021 WL 3855894, at *3 (quoting *Brooker*, 976 F.3d at 237; citing 18 U.S.C. § 3582(c)(1)(A)(i)); *see also United States v. Ciprian*, No. 11-cr-1032 (PAE), Dkt. 2581, at 4 (S.D.N.Y. Feb. 1, 2021) (citing *Brooker*).

 B. Compassionate Release in the Time of COVID-19

 Since the onset of the COVID-19 pandemic, very many courts have held that the presence of medical conditions that increase the risks associated with the virus – in combination with the conditions of confinement – constitute extraordinary and compelling reasons for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A).  *See United States v. Brunetti*, 01-cr-257 (JFK), 2022 WL 92753, at *3 (S.D.N.Y. Jan. 10, 2022) (citing *United States v. Serrano*, No. 13 Cr. 58 (AKH), 2020 WL 5259571, at *3 (S.D.N.Y. Sept. 3, 2020) (collecting cases)).  This Court has come to the same conclusion in several instances.  *See, e.g.*, *United States v. Mcrae*, No. 17 CR. 643 (PAE), 2021 WL 142277 (S.D.N.Y. Jan. 15, 2021) (prediabetes); *United States v. Benjamin*, No. 15-cr- 445 (PAE), Dkt. 1144 (S.D.N.Y. Sept. 15, 2020) (asthma); *United States v. Wilson*, No. 16-cr-317 (PAE), Dkt. 656 (S.D.N.Y. Aug. 31, 2020) (obesity, hypertension, tobacco use, asthma, and injuries he sustained to his neck from a shooting); *United States v. Davies*, 15-cr-445 (PAE), Dkt. 479 (S.D.N.Y.

5

June 26, 2020) (high blood pressure, obesity, and hypertension); *United States v. Brown*, 18-cr-390 (PAE), Dkt. 472 (S.D.N.Y. June 17, 2020) (HIV, Hepatitis C, hypertension, and partial paralysis); *United States v. Hernandez*, 18-CR-834 (PAE), Dkt. 451 (S.D.N.Y. Apr. 2, 2020) (asthma).

In addition, as the COVID pandemic ebbs and flows, but without any indication of permanently receding,[1] courts around the country increasingly are holding that neither an inmate's vaccination status – Mr. Young believes that he has received two Moderna injections (see **Affirmation** at ¶ 69)[2] – nor previous COVID infection, bars consideration of release.[3]

---

[1] In late March-early April 2022, as THE NEW YORK TIMES recently reported, "scientists and health officials are bracing for another swell in the pandemic" from a more aggressive Omicron sub-variant (BA.2), but "the United States isn't doing enough to prevent a new surge from endangering vulnerable Americans and potentially upending life again." Benjamin Mueller, *U.S. Isn't Ready If Covid Surges, Scientists Warn*, THE NEW YORK TIMES, March 20, 2022, at 1, 22; *see also Omicron sub-variant BA.2 spreading across U.S. as COVID cases rise in parts of Europe and China*, CBS News, March 16, 2022, available at https://www.cbsnews.com/news/covid-omicron-ba2-subvariant-ba2-spreads-us-europe-china. Nationally, "BA.2 accounts for a growing proportion of those infections, rising to almost one-quarter of new cases . . . [and] is estimated to be 30 to 50 percent more contagious than the previous version of Omicron." *U.S. Isn't Ready If Covid Surges*, at 22. "As time passes, two doses become less effective at preventing Omicron-related hospitalizations." *Id. See also* **Exhibit 5**, Dr. Chris Beyrer, Professor of Epidemiology and Medicine, Johns Hopkins, *Supplement Regarding the Impact of COVID-19 on Capital Defense Practice*, Mar. 24, 2022, filed in *United States v. Nesbitt*, 18-cr-0036, Dkt. 1022-1, Ex. 880-2S at 1 (W.D. Mo. Mar. 28, 2022) (stating, among other opinions, that "the now circulating omicron subvariant BA.2 [] can evade both natural and vaccine induced immunity in some persons," and that "[b]y June 2022, natural immunity from the December Omicron surge, and most previous infections, will have waned completely.").

[2] No injections are documented in the available medical records. However, despite repeated requests, BOP has only provided Mr. Young with his medical records *through May 20, 2021*, and both vaccinations most likely would have been after that date.

[3] *See United States v. Cavely*, No. 00-cr-157, 2021 WL 2843833, at *5 (**N.D. Okla.** July 7, 2021) (reducing fully vaccinated defendant's sentence of 440 months to time served, after completion of 55% of his full term, concluding that "extraordinary and compelling circumstances presented in

In this District, as Judge Keenan recently explained in *Brunetti*:

> Although the COVID-19 vaccines remain effective at preventing severe illness, they provide comparatively little protection against Omicron infection. See Ctrs. for Disease Control and Prevention, Update on Omicron Variant, December 16, 2021, https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-12-16/06-COVID-Scobie-508.pdf (last visited Jan. 10, 2022) (noting that the Pfizer-BioNTech vaccine is only 33% effective at preventing Omicron infection). The variant's ability to evade vaccine-related immunity has resulted in an exponential increase in "breakthrough" infections in vaccinated individuals. See Ctrs. for Disease Control and Prevention, Potential Rapid Increase of Omicron Variant Infections in the United States, https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html (last visited Jan. 10, 2022).

*Brunetti*, 2022 WL 92753, at *4. In *United States v. Mathews*, in the Eastern District of California, upon finding that COVID variant strains have the ability to infect vaccinated patients, the court reduced the vaccinated defendant's 135-month

---

the instant case relate in part to the lengthy sentence"); *United States v. Sawyer*, No. 5:15-cr-160, 2021 WL 3051985 (**E.D.N.C.** June 15, 2021) (granting release despite full vaccination against COVID); *United States v. Hatcher*, No. 18-cr-454 (KPF), 2021 WL 1535310, at *3 (**S.D.N.Y.** Apr. 19, 2021) (granting compassionate release to fully vaccinated woman without notable medical conditions, based on the extreme conditions of confinement during the pandemic); *United States v. Sweet*, No. 07-20369, 2021 WL 1430836 (**E.D. Mich.** Apr. 15, 2021) (granting release despite full vaccination); *United States v. Pappa*, No. 95-00084-cr, 2021 WL 1439714 (**S.D. Fla.** Apr. 1, 2021) (same); *United States v. Hernandez Sandoval*, No. cr-14-5105, 2021 WL 673566 (**W.D. Wash.** Feb. 22, 2021) (granting release to defendant with Type II *diabetes mellitus*, who had already contracted COVID-19 and was vaccinated); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233, at *4-5 (**C.D. Ill.** June 22, 2020) (citing medical papers and known cases of COVID-19 reinfections and evidence that full recoveries may take years); *United States v. Davis*, No. 06-cr-20020, ECF No. 337 (**C.D. Ill.** July 20, 2020) (granting sentence reduction for *obese diabetic* inmate who tested COVID-positive where "the Court finds that there is a chance that Defendant may contract COVID-19 again" and "the CDC recognizes that it is possible for an individual who had COVID-19 to become infected again by the virus."); *United States v. Malufau*, 2020 WL 4218038, at *1 (**D. Haw.** July 22, 2020) (granting sentence reduction for inmate with obesity, *diabetes*, who "tested positive for [COVID]-19 and was hospitalized for nine days").

sentence to time served.  The court concluded that Mathews "faced an increased personal risk of severe disease associated with coronavirus variants because of his race, sex and substance use disorders, as well as his BMI," finding that as a Black male – like Defendant Aaron Young – Mathews was on average 30 percent more likely to be admitted to an intensive care unit than a female, and 1.5 to 3 times more likely to be hospitalized than a White individual.  *United States v. Mathews*, No. 2:15-cr-00118, 2021 WL 3883735, at *6 (E.D. Cal. Aug. 31, 2021) (citing U.S. Ctrs. Disease Control, *Possibility of COVID-19 Illness After Vaccination* (Aug. 16, 2021)) (footnote omitted).

## III.   Facts and Analysis

A. Exhaustion of Administrative Remedies

On October 30, 2020, Warden S. Lovett denied Mr. Young's request for compassionate release.  *See* **Exhibit 1**.  Accordingly, this Court may now consider whether Mr. Young's circumstances are sufficiently "extraordinary and compelling" to warrant a reduction in sentence, and whether the § 3553(a) factors – "viewed in combination from the vantage point of today" (see *Phillibert*, *supra*, No. 15 Cr. 647 (PAE), 2021 WL 3855894, at *6) – are consistent with such a reduction.

8

B.  <u>Extraordinary and Compelling Reasons for Immediate Release</u>

### 1.  Serious Crisis in Aaron Young's Health Post-Sentencing

When Mr. Young entered the BOP system in December 2018 for his conduct in this case, he was 38 years old, he weighed approximately 170 pounds, and he had no known underlying medical conditions apart from "sharp" and/or "shooting" pain and arthritis, predominantly in his left leg, due to recent injuries.  (He was in a car accident in 2012, as a result of which surgeons placed a rod and screws in his left leg "from femur to below the knee"; in 2015 he was the *victim* of a robbery and shot eight times, which left bullet fragments in his left knee and right arm and leg; and, in 2018, as he was leaving his apartment, he was struck by *a stray bullet* that permanently lodged in his left thigh.)  *See* **Exhibit 2** at 1, 6, 11, 17, 20, 23-24, 30-31, 137; **Affirmation** at ¶¶ 9-10; PSR ¶¶ 124-126.

Because this December 2018 arrest was his first time in federal detention, no medical records were on file for him with the BOP.

It took the BOP nearly two years to order routine diagnostic bloodwork. When baseline diagnostic blood tests were finally run in October 2020, they indicated that Mr. Young's blood glucose was critically elevated at <u>402 mg/dL</u> – the normal range is 70-110 mg/dL – and many other blood markers were either too high or too low.  The initial diagnoses were acute insulin-dependent Type II diabetes

mellitus and hyperlipidemia.  *See* **Exhibit 2** at 71-72.  In 2021, hypertension was added to the list.  *Id.* at 132.

Mr. Young's current medication regimen includes:

(1) 20 units of "NPH insulin" injected subcutaneously twice daily;

(2) "Regular insulin" injected subcutaneously twice daily per sliding scale correlating to instantaneous blood sugar levels measured by finger-prick;

(3) 500 mg. Metformin pills ingested orally three times daily for diabetes (1 before breakfast, 1 before lunch, 1 before bedtime);

(4) 20 mg atorvastatin pills ingested orally daily for hyperlipidemia (high cholesterol);

(5) 10 mg lisinopril pill ingested orally daily for hypertension; and

(6) medication twice daily for anxiety and pain.

**Exhibit 2** at 73-74, 135, 144; **Affirmation** at ¶ 52.

The diabetes, hypertension, and hyperlipidemia, as well as the obesity which has resulted from Mr. Young's diabetes – at 5'5" he is currently 200 pounds, about 30 pounds heavier than at arrest (see **Affirmation** at ¶ 50) – are all independent CDC-recognized medical conditions placing him at increased risk of a severe outcome should he contract the COVID-19 virus.  *See* CDC, *Underlying Medical*

*Conditions Associated with Higher Risk for Severe COVID-19*, updated Oct. 14, 2021.[4]

*Diabetics* in particular, the CDC has recently reported, are "disproportionately affected" by COVID.  *See* CDC, *Morbidity and Mortality Weekly Report*, Jan. 14, 2022.[5]  Moreover, the CDC has found that "[o]besity, diabetes with complications, and anxiety and fear-related disorders *had the strongest association with death*" from COVID-19.  CDC, *Underlying Medical Conditions*, *supra*, at 6 (italics added).

During the course of the pandemic, courts in this District have found extraordinary and compelling reason to reduce the sentences of inmates suffering *from Mr. Young's co-morbidities*.  *See, e.g.*, *Mcrae*, *supra*, No. 17-cr-643 (PAE), (prediabetes, obesity, hypertension); *United States v. Musumeci*, No. 07-cr-402 (RMB), Dkt. 58 (S.D.N.Y. Apr. 28, 2020) (diabetes, high blood pressure, hyperlipidemia, knee pain); *United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (diabetes, hypertension, obesity); *Brunetti*, *supra*, No. 01-cr 257 (JFK), Dkt. 328 (hypertension); *Wilson*, *supra*, No. 16-cr-317 (PAE), Dkt. 656 (hypertension, obesity, tobacco use, injury from a shooting); *Davies*, *supra*, 15-cr-445 (PAE), Dkt. 479 (hypertension, high blood pressure,

---

[4]   https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions; *see also* People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 9, 2022).

[5]  https://www.cdc.gov/mmwr/volumes/71/wr/mm7102e2.htm

obesity); *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) (hypertension, high blood pressure, high cholesterol).

Courts around the country have similarly found extraordinary and compelling reason to reduce the sentences of inmates suffering from Mr. Young's co-morbidities.[6]  Choosing one among so many examples, *United States v. Ford* is particularly instructive.

In *Ford*, the district court granted release to an inmate who had contracted COVID-19.  Ford, like Mr. Young, is middle-aged, suffers from Type 2 diabetes, hypertension, and hyperlipidemia, and had been vaccinated against COVID-19. *United States v. Ford*, 2:10-cr-292, Dkt. 48 at 4 (W.D. La. July 2, 2021).  In granting

---

[6] *See, e.g.*, *United States v. Ford*, 2:10-cr-292, Dkt. 48 (**W.D. La.** July 2, 2021) (diabetes, hypertension, hyperlipidemia); *United States v. Lopez*, 1:18-cr-02846, 2020 WL 2489746 (**D.N.M.** May 14, 2020) (diabetes, high blood pressure); *United States v. Ennis*, No. 3:02-cr-01430, 2020 WL 2513109 (**W.D. Tex.** May 14, 2020) (diabetes, hyperlipidemia, hypertension); *United States v. Mattingly*, 6:15-cr-005, 2020 WL 2499707 (**W.D. Va.** May 14, 2020) (diabetes, hypertension); *United States v. Barber*, 6:18-cr-00446, 2020 WL 2404679 (**D. Or.** May 12, 2020) (diabetes, hypertension, obesity); *United States v. Ramirez*, 1:17-cr-10328, Dkt. 121 (**D. Mass.** May 12, 2020) (diabetes, hypertension, high cholesterol); *United States v. Al-Jumail*, 2:12-cr-20272, 2020 WL 2395224 (**E.D. Mich.** May 12, 2020) (diabetes, high blood pressure, high cholesterol); *United States v. Simpson*, 3:11-cr-00832, 2020 WL 2323055 (**N.D. Cal.** May 11, 2020) (diabetes, asthma); *United States v. Howard*, 4:15-cr-00018, 2020 WL 2200855 (**E.D.N.C.** May 6, 2020) (diabetes, obesity, COPD, kidney disease); *United States v. Pinkerton*, 15-CR-30045, 2020 WL 2083968 (**C.D. Ill.** Apr. 30, 2020) (insulin-dependent diabetes, hypertension); *United States v. Lucas*, 1:15-cr-00143, 2020 WL 2059735 (**W.D.N.Y.** Apr. 29, 2020) (diabetes); *United States v. Dillard*, No. 1:15-cr-170, Dkt. 71 (**D. Idaho** Apr. 27, 2020) (diabetes, hypertension, obesity, COPD, IQ 76); *United States v. Sanchez*, 1:95-cr-00421, Dkt. 290 (**S.D. Fla.** Apr. 27, 2020) (diabetes, hypertension, kidney disease); *United States v. Logan*, 1:12-cr-307, Dkt. 179 (**N.D.N.Y.** Apr. 22, 2020) (diabetes, hypertension, hypercholesterolemia); *United States v. Trent*, 3:16-cr-00178, 2020 WL 1812242 (**N.D. Cal.** Apr. 9, 2020) (diabetes, obesity); *United States v. Rodriguez*, 2:03-cr-00271, 2020 WL 1627331 (**E.D. Pa.** Apr. 1, 2020) (diabetes, high blood pressure); *United States v. Muniz*, 4:09-cr-0199, 2020 WL1540325 (**S.D. Tex.** Mar. 31, 2020) (diabetes, hypertension, renal disease).

release, the court cited medical expert Dr. Arnold Seto, Board certified in Cardiovascular Disease and Critical Care Medicine, who explained that the medical community was "still learning about the lasting effects of COVID-19," and that Ford as a diabetic may have "uncertain long-term cognitive and pulmonary consequences of his illness." *Id.* at 5. The court concluded: "Despite being vaccinated, because of his underlying condition of Type 2 diabetes, Ford remains vulnerable to new COVID-19 variants and is at a greater risk of severe illness or death if he were to re-contract the virus." *Id.*

The court and medical expert were prescient. Six months after the *Ford* decision, *diabetes rose to the very top of the list of underlying conditions of greatest concern*. *See* THE NEW YORK TIMES, *New Research Hints at 4 Factors That May Increase Chances of Long Covid*, Jan. 30, 2022, p. 18. Researchers looking into the mystery of "long" COVID – that is, who is more likely to develop long-term *physical, neurological or cognitive symptoms* that emerge or linger for months after the infections have cleared – very recently identified four biological factors as the culprits, among which is <u>adult-onset diabetes</u>. *Id.* (The other three biological factors are: the level of coronavirus RNA in the blood early in the infection; the presence of certain autoantibodies; and reactivation of dormant Epstein-Barr virus. *Id.*)

The risk Mr. Young faces should he contract COVID-19 is grave. Like Ford and many others, his diabetes and diabetes-induced obesity, in conjunction with

hypertension and hyperlipidemia, make him a candidate for severe and "long" COVID, which can lead to physical, cognitive, and neurological damage. *See id.* However, Mr. Young's situation is worse still because he *already* has a significant degree of cognitive impairment since birth, with an I.Q. of 63. *See* Def. Sent'g Sealed Exhibit A, Dkt. 366-A at 2, 8, 13. And he *already* struggles with physical impairment to his left leg and used a cane prior to arrest (see **Exhibit 2** at 20, **Affirmation** at ¶ 10), on account of a thigh and knee riddled with bullet fragments, a rod extending from thigh to calf with medical screws in the knee, and severe osteoarthritis in his knee and hip. Should Mr. Young end up with life-long COVID, he risks tremendous suffering and significant incapacity.

Mr. Young's heightened vulnerability to COVID-19 on account of his co-morbidities, diabetes chief among them, is the first among several considerations that provide "extraordinary and compelling reasons" justifying his early release.

### 2. Neglect and Negligence at Four BOP Facilities

There's virtually no aspect of our lives that the pandemic hasn't changed. And the limited data sets available suggest that its impact on other health conditions will also be vast. In December [2021], **the National Center for Health Statistics released its final analysis of mortality data for 2020**. . . . The age-adjusted death rate for the U.S. population increased nearly 17 percent, the greatest jump in more than 75 years. *Covid deaths were not the only factor that contributed to that rise, though*. The death rates from cardiovascular disease – that is, strokes and heart disease – increased by 9 percentage points and from Alzheimer's by 8.7 percentage points.

14

> *Deaths from diabetes increased nearly 15 percentage points*.

- Kim Tingley, *We can count cases and hospitalizations – but we can't yet measure the impact of Omicron on public health*, THE NEW YORK TIMES MAGAZINE, Jan. 30, 2022, p. 16 (italics and bold added).

Paradoxically, at the same time that Mr. Young's underlying conditions make him more susceptible to contract the COVID-19 virus and suffer a severe outcome, the inverse is equally true: *The COVID-19 pandemic makes him more vulnerable to succumb to his underlying conditions*.   "Diabetes, cardiovascular disease and Alzheimer's all put people at greater risk from Covid, which can in turn exacerbate those conditions."  Tingley, *supra*, NYT MAG., p. 16; *see also Ford*, *supra*, No. 2:10-cr-292, Dkt. 48 at 5 ("Ford contracted COVID-19 which further complicates his health condition.").

"Controlling diabetes and cardiovascular disease each include eating a healthy diet, exercising, reducing stress and adhering to a regular schedule of medications – all of which were made difficult by the pandemic, *particularly for those whose access to health care was already limited*."  Tingley, NYT MAG., at 17 (italics added).  A healthy diet, exercise, and reduced stress were already difficult for inmates to come by before the pandemic.  But with all the lock-downs and quarantines across the inmate population on account of COVID, *stress* is now sky-high – Mr. Young was on medication for pain and anxiety (Amitriptyline, a/k/a

Elavil) at the onset of COVID and has recently re-started twice daily anxiety medication (**Exhibit 2** at 53, 63; **Affirmation** at ¶¶ 15, 52) – access to *exercise* has greatly diminished, and even the quality and availability of *food* has decreased. (*See infra*, discussing no hot food at the New York detention facilities, and diabetic snacks no longer available.)

But perhaps the most worrying effect of the COVID pandemic for chronic care inmates such as Mr. Young is that *the Health Units*, and particularly the one at his current location (FCI Hazelton), *cannot adhere to a regular schedule of medications*, which can result in patient-inmates quickly decompensating, and diabetics going into shock. *See infra*.

The BOP's response to the pandemic has been fraught from the beginning, and Staff shortages have wreaked havoc on the medical units' ability to function. As Chief Judge McMahon wrote in *United States v. Goode*: "[I]t would be laughable now to argue that Goode would be safer in a Texas BOP medical facility than she would be at home in New York City. . . .  [T]he trust this Court once placed in the BOP to care for an inmate with Goode's complicated health conditions is no longer warranted." *United States v. Goode*, No. 14-cr-810 (CM), Dkt. 514 at 8-9 (S.D.N.Y. Aug. 10, 2020).  Mr. Young would be far safer at home in New York City than at FCI Hazelton in West Virginia, where for months Medical Staff was not available

past 3:00 p.m. – now they stay until 5:00 p.m. – and nighttime insulin injections cannot be administered.  *See infra*.

### a.  At MCC – Failure to Test, Detect, and Diagnose

The failure to provide the most basic medical care – that is, the BOP's inexcusable delay in testing, detecting, diagnosing, and treating Mr. Young – began while housed for 13 months at the Manhattan Metropolitan Correctional Center ("MCC"), a facility since closed on account of its appalling conditions and complete administrative break-down.  *See, e.g.*, *United States v. Days*, No. 19-cr-619 (CM), Dkt. 35 at 19 (S.D.N.Y. Apr. 29, 2021) ("The single thing in the five years that I was chief judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year.  So there is no continuity, there is no leadership, there is no ability to get anything done.  *They lurch from crisis to crisis*.") (italics added).

Upon Mr. Young's arrival at MCC in December 2018, and during a March 2019 physical examination, Medical Staff checked his temperature, pulse, blood pressure (which was elevated), weight (169.7 pounds), and conducted a vision screen (20/20).  *See* **Exhibit 2** at 11, 14, 25.  They ordered an x-ray of his left leg, which

showed the metal rod and screws placed following the car accident, as well as the lodged bullet and several bullet fragments.  *See* **Exhibit 2** at 21, 31-32, 37.  They authorized his use of a knee brace; directed that he always have the bottom bunk bed; and in October 2019, they prescribed the anti-anxiety DULoxetine for pain.  *See* **Exhibit 2** at 22, 27-29, 39.

Staff also asked Mr. Young the standard series of BOP medical history questions – if he had diabetes (no), hypertension (no), carcinoma/lymphoma (no) – *questions which he could not have answered in the affirmative without testing*.  But MCC Staff failed to order testing for those conditions.  *See id.* at 1.

MCC Staff did order tests for tuberculosis (PPD), syphilis (RPR), and HIV – deadly diseases Mr. Young could communicate *to others* – but did *not* order tests for diseases or conditions that might kill *him alone*, taking him instead at his layman's word that he was healthy.  *See id.* at 5, 26. 129.  They did not even perform the simple on-the-spot blood-glucose finger-prick test to rule out pre-diabetes, despite its high incidence rate among New York's inner-city low-income African-Americans like Mr. Young.  *See* **Exhibit 6** ("BOP Management of Diabetes Clinical Guidance") at 57.  (In fact, both of Mr. Young's parents and his brother suffered from diabetes – which has a strong genetic component and is a BOP-recognized risk factor that should have triggered testing (see *id.*) – but BOP Staff did not inquire about his parents and diabetes at that time.)  Nor did MCC Medical Staff ever order

bloodwork to rule out hypertension and heart disease, despite Mr. Young's response in the affirmative that both of his parents died from heart disease at ages 50 and 52, and his own blood pressure measured as high as 175/95 seven months into his stay at MCC.  *See id.* at 11, 32.

b.  <u>At MDC – Ongoing Failure to Test, Detect, and Diagnose</u>

The failure to test for and diagnose life-threatening underlying medical conditions continued throughout his subsequent 7-month stay at the Brooklyn Metropolitan Detention Center ("MDC"), a situation exacerbated by the outbreak of COVID-19 within one month of his arrival.

Within days of his January 27, 2020 arrival, MDC Medical Staff performed a physical, reviewed the x-ray from MCC, and took his temperature, pulse, and blood pressure.  They also asked Mr. Young the same series of standard BOP questions asked at MCC – if he had diabetes (no), hypertension (no), carcinoma/lymphoma (no) – which he still would not have been able to answer in the affirmative, no diagnostic testing ever having been ordered.  *See* **Exhibit 2** at 42-45.  They assessed Mr. Young with neuralgia (stabbing, burning nerve pain), neuritis (nerve inflammation), and osteoarthritis of his left knee, for which they continued the DULoxetine that MCC Staff had prescribed.  *See id.* at 23, 39, 45, 49.

While at MDC, Mr. Young was repeatedly tested for COVID, and isolated and locked down on account of the virus running *rampant* through the facility. It was simply the non-COVID-related testing that was deferred.

### c.   At FCI Ray Brook – Failure to Adequately Treat

The inadequate care continued through his seven months at Federal Correctional Institution ("FCI") Ray Brook. Upon arrival in August 2020, health Staff asked the same series of standard BOP questions (diabetes, hypertension, carcinoma/lymphoma). They took his temperature (normal), but failed to note his blood pressure or weight. *See* **Exhibit 2** at 216-21.

In October 2020, two months into his stay FCI Ray Brook – 22 months since arrest – BOP Medical Staff finally ran diagnostic blood tests. And they conducted a physical and took a thorough history. *See id.* at 69-70, 73-79.

In answer to specific questions, Mr. Young confirmed that his vision was blurry, he was always thirsty, he had to urinate frequently, he was very tired because he woke up often to urinate, and he had a "funny feeling in [the] bottom of both feet." Upon observing his feet, Staff noted nailbed fungus, and skin lesions and cracking at the heel, plantar foot, great toe, second toe, fifth toe. He also told them that he had been feeling so terrible, woozy and dizzy, that in August he had requested discontinuance of the anti-anxiety medication he was taking, because he thought it was the cause of his symptoms. *See* **Exhibit 2** at 66-68, 76-79; **Affirmation ¶¶** at

18, 23.   And he was finally asked about a family history of diabetes, which he confirmed:  his mother, his father, and his brother.  *See* **Exhibit 2** at 78.

Ray Brook Staff also weighed him, which had not been done for more than eight months.  From October 2019 to October 2020, Mr. Young had gone from 173.4 pounds down to 154.0 pounds (see *id.* at 106), a sign of diabetes, particularly in a prison-like setting where individuals tend to gain weight from the very starchy diet.

In other words, had anybody from Medical been paying attention, they could not have missed that Mr. Young was suffering with *all the classic signs and symptoms of raging diabetes* – unquenchable thirst, urinary urgency and nocturia, blurred vision, unexplained weight loss, fatigue, altered sensation in his extremities, abnormalities in the skin of his feet – but nobody at the BOP had been paying attention for 22 months.  *See* **Exhibit 6** ("BOP Management of Diabetes Clinical Guidance") at 57.  *Either Mr. Young arrived into the BOP system with no diabetes, or with pre-diabetes, or with diabetes.  Whichever the situation, the failure to run general baseline diagnostic bloodwork for the 13 months that Mr. Young was at MCC, the 7 months that he was at MDC, and the first 2 months at FCI Ray Brook, led to a delay in diagnosis and delay in treatment that allowed diabetes to take hold and progress to a level that will require life-long administration of multiple insulin injections daily, and that will diminish his life span.*

21

Results from the blood drawn at FCI Ray Brook on October 6, 2020 were back the next day – medically remarkable but not surprising.  His blood glucose was at 402 mg/dL (normal is 70-110 mg/dL) and his hemoglobin A1C was above 18.5 (above 6.4 indicates diabetes).  *See* **Exhibit 2** at 69-70.  That Mr. Young had not gone into a diabetic coma and/or died was quite miraculous:  "Diabetic coma results from these over-concentrated [glucose] conditions, with neurological changes in the brain beginning with levels > 320-330 mg/dL."[7]

With the test results back, Ray Brook Medical Staff documented the following "current" health conditions:

- Type 2 diabetes mellitus;
- Hyperlipidemia;
- Tinea pedis (foot fungus);
- Tinea ungulum (nail fungus);
- Reaction to severe stress;
- Disorder of the skin and subcutaneous tissue;
- Osteoarthritis of knee;
- Neuralgia and neuritis; and
- Dental caries penetrating into tooth pulp.

**Exhibit 2** at 71-72.  (The hypertension remained undiagnosed for another year.)

Once diagnosed with diabetes, however, Mr. Young's health did not sufficiently improve.  As a BOP Care Level 1 facility, FCI Ray Brook Staff recognized the facility's inability to adequately care for Mr. Young as a diabetic.  On

---

[7] *See* https://www.vascularhealthclinics.org/institutes-divisions/diabetes-metabolism-institute/diabetic-coma/since

October 8, 2020, a physician noted that care of his condition was "[n]ot appropriate for RBK [Ray Brook]" and ordered that he be transferred to a higher care level facility, where he was to be placed in the diabetes chronic care clinic; the recommended assessment/transfer date was October 20, 2020. *See* **Affirmation** at ¶¶ 26-27; **Exhibit 2** at 81-82.

*Five months passed* before Mr. Young could be transferred to a Care Level 2 facility. *The COVID-19 pandemic affected the movement of prisoners throughout the BOP system and delayed his transfer.* *See* **Affirmation** ¶¶ 35-37; **Exhibit 2** at 108-13, 120-22. In those five months, Ray Brook was not able to stabilize Mr. Young. Mr. Young's glucose levels, which Medical Staff measured twice daily, swung wildly in October 2020, and throughout the rest of his stay. *See* **Affirmation** ¶¶ 31-34; **Exhibit 2** at 157-76.

The day after his diagnosis and initial insulin injections, a corrections officer found him roaming in a housing unit other than his own "confused." *See* **Exhibit 2** at 87-88; **Affirmation** at ¶ 29. In the following weeks, Mr. Young's eyesight deteriorated to near legal blindness as Medical Staff had great difficulty controlling his diabetes. In October 2020, Mr. Young reported to undersigned counsel that he could "only see shadows of people face[s]"; he could not "read anything" and needed people to fill out a medical release form for him; he had to get inmates to write messages to counsel on his behalf; and he needed inmates to "walk with me to

medical." *See* **Affirmation** at ¶ 32; **Exhibit 3** ("Corrlinks from Client to Counsel")
at 2-6.

Two weeks after his diagnosis, he had an inmate write to counsel: "This
facility do not have the proper medical treatment for me here[.]  I just hope I don't
go blind before they treat me." **Affirmation** at ¶ 32; **Exhibit 3** at 4.[8]  Four weeks
after his diagnosis:  "I'm having nose bleeds every night and dizziness with
headaches I've told the doctors that they have here and just tells me to put in a sick
call but they don't answer that." **Exhibit 3** at 8.  And on November 11: "hello their
how are you today my vision is really getting bad." *Id.* at 9.

### d.  At FCI Hazelton – Inadequate Treatment Due to COVID-19

On March 2, 2021, five months after his diagnosis, the BOP transferred Mr.
Young to FCI Hazelton, a Care Level 2 facility in Bruceton, WV.  At both USP
Lewiston – a transfer point – and FCI Hazelton, Staff reviewed with Mr. Young the
BOP's standard questions.  Oddly, both institutions marked that he denied all
illnesses, including diabetes. *See* **Exhibit 2** at 114, 123.  Clearly, he would not deny
the life-threatening illness, and diabetes was all over his transfer paperwork. *See id.*
at 112, 120.  Apparently the standard BOP intake forms were not rigorously

---

[8]  In 2019, the BOP recorded Mr. Young's eyesight as 20/20. *See* **Exhibit 2** at 25.  Following his
diabetes diagnosis in October 2020, at undersigned counsel's urging, Mr. Young asked Health
Services, repeatedly, to see an eye specialist.  He was told he would have to wait for three months,
then they told him six months, and ultimately he was informed that no eye exam would be possible
until October 2021.  Mr. Young finally had an eye doctor visit in the end of 2021, but he was not
given the results of the vision screen, and records have not been provided despite repeated requests.

completed, and not with the care necessary to guarantee an inmate's health, safety, and welfare.

One month into his stay at FCI Hazelton, a physician ordered that he be added to *three* separate chronic care clinics:  diabetes, hyperlipidemia, and hypertension. *See* **Exhibit 2** at 132.  At FCI Hazelton, however, his treatment remains grossly inadequate and his health at great risk, on account of restrictive COVID protocols and COVID-caused Staff shortages.

As of January 2021, 80 inmates and 22 staff at FCI Hazelton had recovered from COVID.  *See* Kathy Plum, *How local prisons are coping with the ongoing pandemic*, THE DOMINION POST, Jan. 10, 2021.  As of May 2022, 162 inmates and 123 staff have recovered from COVID; two inmates have died.  *See* www.bop.gov/coronavirus/index.jsp.  (Currently, Hazelton has approximately 2100 inmates, 1600 of whom are at the correctional facility and 500 at the camp.  *See* www.bop.gov/locations/institutions/haf/.)

The high number of Staff who contracted the virus was likely a result of many of them choosing not to wear masks and not to be vaccinated.  When Mr. Young arrived at Hazelton, only 35% of the Staff and 10% of the inmates had received their first vaccination.  *See* Kathy Plum, *Hazelton prison has first COVID-19 inmate death; Warden explains pandemic procedures; efforts to hire staff*, THE DOMINION

POST, Jan. 25, 2021.[9]  "Hazelton was given 660 doses and *not all staff chose to get it*, so the rest was given to inmates."  *Id.* (italics added).

The staff shortages at FCI Hazelton resulting from the pandemic, in turn, have had a particularly negative impact on the functioning of its Health Unit.  According to local news reporting midway through the pandemic, "[s]taffing has been an ongoing struggle at Hazelton," but once the pandemic started, "hiring slowed dramatically[,] . . . [and] mandatory overtime for officers and *augmentation reassignment* of non-officer staff has [sic] went through the roof."  Kathy Plum, *How local prisons are coping with the ongoing pandemic*, THE DOMINION POST, Jan. 10, 2021 (italics added).  ("Augmentation reassignment" means that prison employees, such as Medical Staff, who are not correctional officers are reassigned to correctional positions "to fulfill an officer's duties."  *Id.*)  By the end of 2020 and into 2021, "15-25 'augmented' personnel are called on to cover officer posts each day . . . keep[ing] those staff from performing the regular, important work that they were hired to do.  COVID has definitely made it more difficult to hire staff."  *Id.* Non-correctional personnel have also been diverted to meal preparation and service, as inmate work details have been eliminated.  *Id.*  And among diverted non-correctional personnel is Medical personnel.

---

[9]  https://www.dominionpost.com/2021/01/25/hazelton-prison-has-first-covid-19-inmate-death/

In April 2021, on account of COVID-19 prevalent in the institution and the surrounding county – and the high rate of Staff absenteeism – FCI Hazelton was designated at BOP Operational Level 3 (the highest/poorest), "meaning that the prison is running with 'intense modifications'." Sam Kirk, *Inmate serving life sentence at Preston County prison [FCI Hazelton] dies from COVID-19*, WBOY NEWS, Nov. 30, 2021.[10]   According to the BOP, each Facility determines its own operational level based on its COVID-19 medical isolation rate (if at or above 7%), its combined percentage of Staff and inmate completed vaccinations series (if less than 50%), and their respective community transmission rates (if the community transmission rate is ≥ 100 per 100,000 over the last 7 days). *See* BOP COVID-19 Operational Levels, link BOP: BOP's COVID-19 Overview.[11]   As of May 31, 2022, FCI Hazelton is still running at Operational Level 3. *See* FCI Hazelton (bop.gov).

What this has meant for Mr. Young is that Medical Staff members are continually reassigned to correctional posts (and other services), with the result that the Medical Unit has been kept from adequately treating him and other chronic care inmate patients. By way of comparison, at Ray Brook ("RBK") during the height of the pandemic, Medical Staff *never missed the critical twice daily blood draw* to see if Mr. Young needed Regular insulin added to his NPH insulin regime; whereas

---

[10]  https://www.wboy.com/news/health/coronavirus/inmate-serving-life-sentence-at-preston-county-prison-dies-from-covid-19.
[11]  https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.

Medical Staff at Hazelton ("HAX"), to which Mr. Young transferred on March 2, 2021, *missed the twice daily blood draw repeatedly* (on 3/4/21, 3/7, 3/8, 3/10, 3/13, 3/14, 3/22, 3/25, 3/27, 3/28, 3/29, 3/31, 4/1). *See* **Exhibit 2**, *compare* 157-76 (RBK) *with* 155-57 (HAX). "Shoot and go" (i.e., inject the NPH and move along) is what they tell Mr. Young when there is no time for the finger prick. *See* **Affirmation ¶** 59.

Then from April 2, 2021, until the end of the available records (May 20, 2021), instead of leaving gaps in his chart when they did not allow him time to draw blood, they instead marked down that Mr. Young "refused" to prick his finger. *See id.* at 149-55.

### i.  Administration of Insulins:  Outdated and Mistimed

Mr. Young receives the BOP's "conventional insulin therapy," which comprises (1) "twice-daily administration of a combination of short-acting (regular)" insulin, and (2) "intermediate-acting (NPH)" insulin. *See* **Exhibit 6** at 17. This is far from ideal.  First, because the regimen is decades outdated; second, because the two insulins are best administered at separate times, which the BOP cannot readily facilitate.

According to Daniel Lorber, M.D., the 2007 Joint Chair of the American Diabetes Association/National Commission on Correction Health Care, the use of the short-acting sliding-scale Regular insulin has "not been the community standard

for diabetes treatment since the early 1980s," because it "result[s] in erratic glucose control" with wide swings in blood sugar.  *See* **Exhibit 4** ("Report of Medical Expert Daniel Lorber, M.D.," from *United States v. Richards*, 15-cr-108, Dkt. 324-1 (W.D. Pa. Oct. 6, 2020)), at 2 (italics added).

The BOP has acknowledged as much.  In its Management of Diabetes Manual, the BOP advises its clinicians that use of Regular sliding-scale insulin "*is not a recommended strategy for long-term management of patients with diabetes*" *because*, in the correctional setting, *it cannot be coordinated with food intake.  See* **Exhibit 6** ("BOP Manual") at 17 (italics added).  Mr. Young has received Regular insulin twice daily on a *long-term basis*; that is, for the approximately 19 months since his October 2020 diagnosis.

"[I]deally," the BOP Manual advises, <u>Regular insulin</u> "should be administered <u>prior to a meal</u> to allow some absorption of insulin prior to the rise in blood glucose that occurs during a meal."  *Id.* at 19 (underline added).  Otherwise, as the Manual explains, *"[t]he consequences of insulin/food mismatch* are, at best, suboptimal control of hyperglycemia [excess glucose in the blood]; at worst, the result of insulin/food mismatch *is frequent and potentially severe hypoglycemic episodes*."  *Id.* p. 19 (italics added).

Since his diagnosis in October 2020, however, Mr. Young has been receiving the Regular insulin doses *after* meals; that is, consistently on an *insulin/food*

*mismatch basis*.  **Affirmation** at ¶¶ 60-62.  By way of just one example of the ongoing mismatch, from April 11 to April 14, 2021, meals at FCI Hazelton were served at 6:30, 11:30 and 17:00 (see **Affirmation** at ¶ 60), but Medical Staff administered insulin to Mr. Young at:  07:37 and 18:59 (Apr. 11); 06:45 and 17:32 (Apr. 12); 08:45 and 17:20 (Apr. 13); 08:11 and 20:24 (Apr. 14).  *See* **Exhibit 2** at 153-54, 192.  And from October 2021 to April 2022 – for which no medical records have been made available – Mr. Young reports receiving his insulin at 6:30 and 14:30, because Medical Staff was *no longer on-site after 15:00*.  *See* **Affirmation** at ¶ 62; **Exhibit 3** at 15, 18.  Predictably, Mr. Young's blood glucose levels *swing wildly*.

Blood glucose readings available from March 2021 – before Staff began marking "refused" in Mr. Young's chart – indicate ongoing, significant fluctuation: **305** mg/dl (3/3/21), 212 mg/dl (3/4/21), 133 mg/dl (3/5/21), 127 mg/dl (3/5/21), **78** mg/dl (3/6/21), 122 mg/dl (3/6/21), 148 mg/dl (3/7/21), **252** mg/dl (3/9/21), etc.  *See* **Exhibit 2** at 156-57.  And each time a reading is above 150, units of Regular insulin must be given.  *Id.* at 73.

According to Dr. Lorber, *glucose level swings are very dangerous* because they can lead to loss of consciousness, falls, and wounds, which in Mr. Young's case are risks heightened by his impaired gait (due to the metal rod in his left leg and osteoarthritis in his hip and knee), and his blurry vision when his insulin is delayed.

Dr. Lorber explains further that in the event a diabetic does sustain a wound from a fall or other cause, *sliding Scale Regular insulin is particularly contraindicated* because it hinders the diabetic's ability to effectively fight off infection, which requires blood glucose levels to be kept as close to normal as possible.  *See* **Exhibit 4** at 2.  It is a Catch-22 as the "outdated [Regular] insulin regimen" is more likely than other regimens to lead to injuries, and then it hinders healing.

Moreover, the simultaneous administration of Regular and NPH insulins in the prison setting is contraindicated.  While Regular insulin should precede meals, the BOP Manual advises clinicians that the evening dose of the more critical <u>NPH insulin</u> – which Mr. Young must receive twice daily regardless of fluctuating blood glucose levels – "should be administered <u>at bedtime</u> or as close to bedtime as feasible."  **Exhibit 6** at 17 (underline added).

At FCI Hazelton, inmates are locked in their cells for the night at 20:45, and lights are out at 23:00.  *See* **Affirmation** at ¶ 60.  Mr. Young has been receiving his second NPH dose typically *hours before* bedtime.  By way of example, the times that Staff administered the second NPH dose throughout April 2021 ranged from 16:59 to 22:17; the most common timeframe was 17:05 to 17:30 and only twice did Staff administer the NPH after 22:00.  *See* **Exhibit 2** at 151-55, 192.

Then, in October 2021, Hazelton was no longer able to staff its Medical Unit past 15:00 and Mr. Young received his second (and final) dose at 14:30, eight hours

before bedtime.  Recently, in May 2022, the Medical Unit Staff now stays until 17:00, but as inmates are locked in for the count at 15:30, Mr. Young receives his final dose between 14:30 and 15:30, still seven to eight hours before bedtime.  *See* **Affirmation** at ¶ 62.

Because Staff administers the NPH and Regular insulins together, per BOP policy, and the last dose is now given at or before 15:30, *FCI Hazelton is not providing care that meets the BOP's own standards of proper and accepted treatment*.  *See* **Exhibit 6** at 17.  The Regular insulin is often improperly administered *after* meals, and the NPH is always improperly administered at least seven hours *too soon*.

### ii.  Lack of Prescribed Diabetic Snacks

In an effort to somewhat remedy the correctional facilities' inability to abide by the BOP's diabetes management protocol, physicians at FCI Ray Brook prescribed two diabetic snack bags daily for Mr. Young, to eat immediately after receiving his afternoon insulin.  *See* **Exhibit 2** at 92.  He regularly received these bags (which consist of cheese, fruit, and bread), while at FCI Ray Brook.  *See* **Affirmation** at ¶ 67.  However, since arriving at FCI Hazelton on March 2, 2021, Mr. Young has not been receiving the snack bags at all, despite the order for "2 x day" diabetic snack frequency listed on his BOP transfer paperwork.  *See* **Exhibit 2** at 110, 113, 121; *see also* **Affirmation** at ¶ 67.  Instead, Mr. Young has had to buy

himself snacks from the Commissary, but due to intermittent lock-downs and supply shortages, he often goes without the snacks, and becomes woozy and unable to stand, he loses energy and feels listless ("downer"), he gets headaches near his eyes and his vision blurs. **Affirmation** at ¶ 67.

### iii.    Self-Examination and Self-Care Impossible

At FCI Hazelton, on account of Staff shortages, Medical Unit personnel informed Mr. Young that because they could not see him daily, *he would have to be responsible for examining his body for scabs and ulcerations*, with particular attention to his feet. *See, e.g.*, **Exhibit 2** at 133, 146; **Affirmation** at ¶ 65. Mr. Young, like many diabetics, has almost no feeling in his feet and so is unaware when they are injured.

According to the Diabetes Overview on the Mayo Clinic's website: "Nerve damage in the feet or poor blood flow to the feet increases the risk of various foot complications. Left untreated, cuts and blisters can develop serious infections, which often heal poorly. These infections may ultimately require toe, foot or leg amputation."[12] *See, e.g.*, *United States v. Richards*, 15-cr-108, Dkt. 342 (W.D. Pa. Oct. 6, 2020) (granting compassionate release despite no active COVID cases at the prison, to diabetic who when left to care for himself cut his skin while trying to trim

---

[12] *See* www.mayoclinic.org/diseases-conditions/diabetes/symptoms-causes/syc-20371444

toenails which he could not see, resulting in an infection that turned into gangrene and led to the amputation of his forefoot); *see also* **Exhibit 4** at 3.

Mr. Young, however, is *physically unable to check his left foot on account of the rod (with screws) running from his thigh to his calf*, as well as the osteoarthritis in his left knee and "severe" osteoarthritis in his left hip.  *See* **Exhibit 2** at 20, 30-31, 137.  He simply cannot move the leg in a position to be able to see the underside of the foot, and must rely on a cellmate or other inmates to check his feet daily, which is *not* something they regularly agree to do.  **Affirmation** at ¶ 65.  (It should be noted that Mr. Young has significant chronic foot fungus and nail bed fungus, which must make his feet particularly unappealing to others.)  And so, just like Richard Roberts, who could not see his feet when cutting his toenails and ended up with gangrene and amputation, Mr. Young is at risk of both failing to notice a wound and actually causing one.

In addition to checking his feet daily, Mr. Young was advised to rub them with ointments, creams, and moisturizer, to prevent scabbing and to control the foot and nailbed fungus, to which he is very susceptible as a diabetic.  *See* **Exhibit 2** at 78-79, 93; **Affirmation** at ¶ 66.  (According to the Mayo Clinic:  "Diabetes may leave you more susceptible to skin problems, including bacterial and fungal infections."  *See* footnote 12.)  At FCI Ray Brook, Medical Staff provided these products, but at FCI Hazelton it is up to him to purchase them at the Commissary,

whenever they are available and whenever he has the funds.  *See* **Affirmation** at ¶ 66.

The mouth is another area of critical self-care concern for a diabetic. According to the BOP's Manual, diabetics are at greater risk of developing "gum disease, fungal infections, infection, salivary gland dysfunction, tooth decay, inflammatory conditions, and delayed healing." **Exhibit 6** at 28.  The Manual notes further that "[p]eriodontal disease is a very common oral health complication associated with diabetes, with research suggesting that periodontal disease is more frequent and severe in patients with diabetes.  An infective and inflammatory disease such as periodontitis can have pronounced adverse effects for individuals with diabetes, due to patient's altered immune system and reparative processes." *Id.* at 29.  (His osteoarthritis is also an independent diabetic risk factor because the inflammation promotes insulin resistance.[13])

Among the "Cardinal Signs of Periodontitis" listed in the BOP Manual is tooth loss. *Id.  Mr. Young has lost 21 teeth.  See* **Exhibit 2** at 96-97.

In addition, from his arrival into BOP custody in December 2018, Mr. Young complained to Medical Staff of pain in his mouth and/or teeth on the following dates: 12/19/18; 7/27/19 (pain "10/10" with "left lower jaw swelling"); 9/4/19 (pain

---

[13] *See* Teresa Dumain, *Arthritis and Diabetes:  Understanding the Connection, and How to Lower Your Risk*, July 29, 2019, available at creakyjoints.org/comorbid-conditions/arthritis-and-diabetes/ (citing John Davis, III, a clinical rheumatologist at the Mayo Clinic (Rochester)).

"10/10" with "left lower jaw swelling"). *See id.* at 3, 32-33, 36. It was not until November 3, 2020 that a dentist noted in Mr. Young's chart "gross decay" and "poor" dental hygiene, listing "8 decayed, 21 missing, 2 filled" teeth, and no dentures. *Id.* at 96-97. No dental care was ever provided.

On March 24, 2021, when Mr. Young put in yet another request to see the dentist, he was told "Dental Staff will report to your unit to triage your concern you are having, when time and staff allow." *See id.* at 131. When a dental hygienist finally visited him on May 3, 2021, Mr. Young complained of "real bad" aching and throbbing teeth with a pain scale 9. The hygienist identified seven affected teeth. *See id.* at 142-43. Nothing was done for him.

Because FCI Hazelton was "operating under established COVID-19 protocol," he was told to "present to the facility dental clinic at a later date . . . for further evaluation as COVID-19 protocol evolves and security, time, staffing, and priority of treatment dictates." *Id.* at 143; **Affirmation** at ¶ 43. The following day, a dentist "review[ed] [the] hygiene triage note," and wrote that Mr. Young did "not fit criteria for emergent or urgent care." **Exhibit 2** at 144; **Affirmation** at ¶ 44. (Following this date, undersigned counsel has no further medical/dental records.)

A diabetic attempting oral self-care, but having to *wait more than one month* simply for a hygienist to look into his mouth – setting aside the fact that no treatment was ever provided – is at great risk of developing an abscess that will go unnoticed

and unmedicated and lead to serious infection, either from the upper teeth/gums into the brain, or from the lower teeth/gums to the heart.  (That he was left to suffer prolonged and excruciating pain, a 9 on a scale of 10, in and around those few teeth that he still has, has been of no consequence to the BOP.)

In sum, Defendant Young's *ability* at the correctional facility *to provide self-care* – predominantly for his feet and gums – is critical as a diabetic, but "substantially diminished" in his current environment.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

### iv.  Unsafe Distribution of Medication

The unsafe manner of medication distribution at FCI Hazelton is another serious problem.

*When not locked down or quarantined*, Mr. Young goes to the Medical building for his insulin every morning and then again every afternoon.  There are 12 buildings housing inmates, with four units each, and they all share the Mess Hall, the Yard, prison classes, and the Medical Center.  *See* **Affirmation** at ¶ 53-54.

Each Unit's officer in charge announces over a loudspeaker "Diabetic Movement," at which time Mr. Young goes to the Medical building to receive his injections.  (He reports that at least a few times a month, and sometimes once a week, the officer in charge does not make the announcement, and the inmates in his Unit miss that insulin injection.  *See, e.g.*, **Exhibit 2** at 149-53 (marked as "No show").)

He then waits on line *outside* of the Medical building with other chronic care inmates from all the Units, stepping inside only when it is his turn to get his injections. *See* **Affirmation** at ¶ 55.

Between October 2021 and April 2022, however, the inmates were no longer permitted to step inside the doorway for their afternoon injections, instead receiving them outside. (As of May 2022, they are again allowed to step inside the doorway for the afternoon injection.) The temperature in Bruceton Mills, in the Appalachian Mountains, is extremely cold in winter, dropping well below freezing and with significant snow. Waiting on line, while standing in the snow, as Mr. Young has often done, poses a very serious risk of frostbite, and has caused intense dryness and exacerbated the cracking of his feet, all of which can lead to sores, infection and then gangrene if not timely caught. *See* **Affirmation** at ¶ 55-56.

Waiting on line has also caused Mr. Young to miss doses of insulin. From time to time, particularly when snow is on the ground, inmates try to skip to the front of the line, which leads the Staff to send them all back to their dorms without having received their injections, in an effort to prevent a brawl. *See* **Affirmation** at ¶ 57.

At other times, when the line is too long or too slow in the morning and Mr. Young is feeling faint and dizzy and his feet numb, on account of his blood sugar, he leaves to go get something to eat to stabilize himself, but when he returns to the

line for his insulin, guards sometimes do not allow him and send him back to his Unit.  *See* **Affirmation** at ¶ 58.

*When locked down and/or in quarantine*, the Medical Staff is often unable to deliver the insulin injections to the inmates in their cells according to the routine schedule.  Many times, Mr. Young has received his morning and afternoon injections only four hours apart, instead of the prescribed eight to nine hours, which causes him to suffer the diabetic symptoms described above (woozy, depressed, exhausted, etc.).  *See* **Affirmation** at ¶ 53.

### v.    Access to Care Limited

Another drawback on account of Staff shortages at Hazelton is the limited access to the chronic care clinics.  Mr. Young is not permitted to just stop by the Medical Unit, as he did at FCI Ray Brook, for something as simple as asking Staff to check his feet and skin, or as serious as when he experiences pressure pain around his kidneys and in his chest and neck.  At FCI Hazelton, he must put in a formal request ("cop-out") and wait days to be called in; thus, he often does not bother, hoping the pain will diminish rather than escalate to crisis level.  *See* **Affirmation** at ¶ 63.

In the event of medical crisis, there is no longer a physician or any medical personnel on site after 5:00 p.m.; and, in March 2022, Hazelton lost its contract with the local hospital.  *See* **Affirmation** at ¶ 64.

### vi.    Need to Be Placed in a Care 3 Facility

FCI Hazelton is failing to control Mr. Young's diabetes by diet, exercise, and stress reduction, and is actively posing a risk to his health in the time, manner, and place they deliver his insulin injections.  Mr. Young has not yet fallen into a diabetic coma – nor injured himself when walking around dizzy and with blurred vision – nor had an uncontrollable infection to his extremities – but he is every day at risk of just such an occurrence.

Mr. Young should have been placed in a Care Level 3 facility instead of at FCI Hazelton.  The BOP is totally failing him.  According to the BOP Clinical Practice Guidance, "Conditions Defaulting to Care Level 3" include:

> Intensive insulin therapy required to achieve glycemic control in type 2 DM [diabetes mellitus] (considered on a case-by-case basis in consultation with the Regional Medical Director; decisions will be based in-part on the use of a *long acting insulin or* the ability of the institution to provide a *near-bedtime dose of NPH insulin*, as well as *pre-meal* regular insulin three times daily) **or**
> . . . **or**
> Poorly controlled (*HbA1C greater than 9%*) for at least *12 months*, despite provider's adherence to clinical guidance[.]

**Exhibit 7** ("BOP Clinical Practice Guidance, Care Level Classification, May 2019") at Appendix 1 *Medical Conditions Defaulting to Care Level 3 of 4* (italics and brackets added, parentheses and bold in original).

FCI Hazelton fails at all considerations:  it does *not* use long-acting insulin (the NPH Mr. Young receives is intermediate-acting, and Regular insulin is short-

acting); it is *not* able to provide a near-bedtime dose of NPH, but provides it seven to eight hours early; it does *not* provide Regular insulin pre-meal, administering the second dose midway between lunch and dinner for most of the past year; and, despite its adherence to clinical guidance, Mr. Young's HbA1C was greater than 9% for 12 months – it was 18% in October 2020 and 12% in April 2022 (see **Exhibit 2** at 70 and **Affirmation** at ¶ 22).

Mr. Young is at risk if he remains in a Care Level 2 facility.  More dire still is the fact that FCI Hazelton lost its contract with the local hospital in March 2022, and Mr. Young has heard that it will be downgraded to a Care Level 1 facility.  *See* **Affirmation** at ¶ 64.  *But nobody outside of the BOP – not the inmate, his family, nor this Court – has any chance of effecting a transfer*.

The BOP's gross neglect and inadequate treatment of Mr. Young at four correctional facilities (three during the COVID pandemic) – allowing his diabetes to go unchecked and progress to a life-threatening level – is a second extraordinary and compelling reason justifying release.

### 3. Detention and Incarceration During the Time of COVID-19

A third extraordinary and compelling ground, which pales in comparison to the two above, but which courts in this District have relied on to grant reductions at resentencing, as well as to initially impose shorter sentences than they otherwise

would have, is the horrific condition of detention in MDC and MCC, both historically and during the pandemic.

"[A] long history of neglect and brutality at [MDC] . . . has been documented in previous Justice Department reports.  Investigators over the years have issued findings that suggest the jail is among the worst in the federal system. . . .  'It's my opinion,' a former warden at the jail . . . said in an interview, that over the last decade 'the M.D.C. was one of the most troubled, if not the most troubled facility in the Bureau of Prisons'."  Annie Correal and Joseph Goldstein, *"Cold as Hell":  A Dark Week In a Harsh Jail*, THE NEW YORK TIMES, Feb. 10, 2019, pp. 1 & 15.

In a civil action against the Warden of MCC, in May 2020, physician and epidemiologist and former Deputy Medical Director of the Correctional Health Services of New York, Dr. Homer S. Venters, submitted an evaluation of the jail on behalf of the plaintiffs.  Among many gross inadequacies, he found that almost all of the housing areas and other common spaces at MCC were "widely infested with mice and roaches," and noted in particular "the presence of these vermin in cells utilized for medical isolation."  *Fernandez-Rodriguez, et al. v. Marti Licon-Vitale, Warden of MCC*, No. 20-cv-3315 (ER), Dkt. 51-1 at ¶ 20 (S.D.N.Y. May 26, 2020).  Specifically with regard to inmates' attempts to get medical attention, Dr. Venters wrote:  "Information I have gathered from my tour of the MCC and review of

available information indicates that virtually all of the[] steps of sick call are broken or grossly deficient in MCC." *Id.* at ¶¶ 38-39.

At a sentencing before Judge McMahon in 2021, the defendant (Tiffany Days) recounted conditions during her time at MCC, *which overlapped for several months with Mr. Young's stay*:

> I also survived the disgusting feces flood that we were actually told to clean with our own hands. It was humiliating. Floating, dead water bugs, mice, chunks of defecation coming out of the pipes and urine-filled water gushing all through the area. The water was as high as my ankles, and the smell was as bad. It was so bad, the inmates were vomiting due to nausea. Chunks of feces. And officers telling us that we had to clean it and clean it quick because lunch was on the way.
>
> I froze in a cell for seven-and-a-half months with no heat, sleeping with a hat, gloves, sweat pants and sweatshirts. . . . The tears I cried, they were frozen on my face. My roommates were mice. They would come out of large holes in the wall that were as big as tennis balls, jumping around, running around the cells, just playing on the vents.

*United States v. Days*, No. 19-cr-619 (CM), Dkt. 35 at 14-15 (Apr. 29, 2021).[14]

At a sentencing before Judge Wood in 2021, the defendant (Sean Merchant), through counsel Susan Kellman, described to Judge Wood his time at MDC during COVID, where Mr. Young spent eight months:

> After a few months at MDC my client explained to me that MCC was a walk in the park, and that's really just horrifying. I have a client who

---

[14]  Mr. Young's Disciplinary Record from December 2018 through April 2022 notes just two disciplinary incidents, both of which occurred in early 2020, while at MDC. The first was when he stuffed bits of material under the cell door *to try to keep out the rodents*, for which guards wrote him up as "interfering" with a "security device" (i.e., the door). The second was a fight, where according to the medical records he was punched in the face and head repeatedly. *See* **Exhibit 8** ("Discipline Record"); **Exhibit 2** at 61-62.

is at MDC now in SAMs custody locked down 24/7 who explains to me that *his three years in prison in Tunisia were a walk in the park compared to the MDC*.

Just this weekend, or for the last three or four days, again, *this has been ongoing since COVID*, *no hot food* and the inmates, and I am sure your Honor has heard this from many other lawyers, but they've got it down to a science now – I'm not sure why the bologna sandwiches are all frozen – but they get frozen bologna, four slices of white bread in a neat little picnic basket with *two slices of chicken bologna, frozen*, four slices of white bread, *a child size tube of peanut butter* and another child size tube of jelly so that they can squeeze it onto their white bread when it defrosts, a bag of pretzels because why not?  And a little squeeze juice thing for a four-year-old and a bottle of water.

This past weekend the systems were all shut down and toilets weren't flushing.  Now the cells have between two and four more people than they can handle bunk beds are abounding.  So now you have four to six men sharing a toilet that can't be flushed.

*United States v. Merchant*, 18-cr-527 (KMW), Dkt. 271, at 20-21 (S.D.N.Y. Oct. 12, 2021) (italics added).  Judge Wood then gave the defendant 39 months' credit off the sentence she otherwise would have given:  "I am giving you one day extra credit for every day that you spent at MCC and the MDC."  *Id.* at 33.

Judge Oetken stated something quite similar at a sentencing in April 2021:

Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh.  Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming.  And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially *the equivalent of either time and a half or two times what would ordinarily be served*.

44

*United States v. Gonzalez*, 18-cr-669 (JPO), Dkt. 250 at 17-18 (S.D.N.Y. Apr. 2, 2021) (italics added) (sentencing defendant to 24 months' time-served, well below the Guidelines range of 78 to 97 months).  *See also United States v. Nunez*, 19-cr-691 (CM), Dkt. 28 at 12 (S.D.N.Y. May 5, 2021) ("terrible" conditions at MDC during the pandemic, "of which this country should be massively ashamed"); *United States v. Morgan*, 19-cr-209 (RMB), Dkt. 90 at 14 (S.D.N.Y. May 5, 2020) ("[T]he living conditions at either the MCC or the MDC, [] are only many times compounded by this coronavirus that is plaguing the country. . . . It is an outrage, I have to say, and I'm very disappointed that the Attorney General has not followed through on making a thorough investigation."); *United States v. Rodriguez*, 19-cr-817 (LAK), Dkt. 45 at 17 (S.D.N.Y. Oct. 6, 2020) ("very unusual and very harsh" conditions at MDC during pandemic); *United States v. Espinal*, 19-cr-622 (DLC), Dkt. 54 at 26-27 (S.D.N.Y. Aug. 6, 2020) (taking into account the "harsh" and "brutal" conditions at MDC during pandemic); *United States v. Carillo-Berber*, 18-cr-703 (PAC), Dkt. 28 at 24 (S.D.N.Y. June 11, 2020) (discussing harsh conditions at MDC).

*And this Court has spoken powerfully about the abysmal conditions in the New York detention centers during COVID.*  At the sentencing of Aracena de Jesus in July 2020, for example, this Court granted a substantial downward variance, stating:

> I am mindful . . . that you have served most of your time in prison
> so far during the worst pandemic in this country during the past 100

45

years. . . .  I'm mindful that your *experience in prison* as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was *frightful*.  Prison is supposed to be punishment, but it is not supposed to be *trauma* of that nature or close. . . .  Bottom line, your time in the MCC was *way harder than anyone intended* when you were detained following your arrest.  Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the *unexpected and regrettable ardors* that you experienced since your arrest in December.

*United States v. Aracena de Jesus*, 20 Cr. 19 (PAE), Sent. Tr. at 36-37 (S.D.N.Y. July 1, 2020) (italics added).

Mr. Young suffered 13 months of appalling conditions detained at MCC before the coronavirus erupted; and then, after his December 2019 sentencing, he was detained for 7 months in wretched conditions at MDC during the initial wave of the pandemic, awaiting transfer to a prison that was delayed on account of COVID. Mr. Young, like Aracena de Jesus, has experienced unexpected and regrettable ardors and trauma since his December 2018 arrest.  It has been time way harder than this Court or anyone intended when he was detained following arrest.  And there is no end in sight to COVID, and no end ever to his diabetes since the BOP allowed it to progress to the point of no return.

### 4. Intervening Changes in the Law of the Case Render Mr. Young's Sentence Disparate and Unjust

"Multiple courts have identified unwarranted sentence disparities as justifying sentence reductions."  *United States v. Robles*, 553 F. Supp. 3d 172, 180 (S.D.N.Y. 2021) (Engelmayer, J.) (citing cases).  This Court sentenced Mr. Young to a prison

term of 240 months, which was far longer than the sentence it imposed on the gang's godfather, who pled guilty to the same offense as Mr. Young, and on co-conspirator Aljermiah Mack, who was convicted at trial of the same offense to which Mr. Young pled guilty.

From the time of Mr. Young's December 2019 sentencing to the time of co-defendant Aljermiah Mack's February 2020 sentencing, however, there was a *consequential* change in this Court's treatment of the *nature and quantity of the controlled substance* the conspiracy trafficked.   This change resulted in an unjustifiable sentencing disparity between co-defendants charged and convicted of the same offense, and presents a fourth and final "extraordinary and compelling" reason justifying a sentence reduction.   *Cf. Robles*, 553 F. Supp. 3d at 178-79 (holding that the intervening consequential change in the law's treatment at sentencing of multiple firearms counts presents an extraordinary and compelling reason that may be considered together with other factors – to wit, the unjust length and disparity of defendant's sentence, and the impact of the COVID-19 pandemic – in the § 3582 equation).

The breadth of what constitutes an "extraordinary circumstance" is vast and broadening daily; so, too, is the consensus among courts that even claims rejected on direct appeal or collateral review may now support early release.   *See, e.g.*, *Brooker*, 976 F.3d at 237-38 (holding that a court should consider "all possible

reasons for compassionate release," including the "injustice of [a defendant's] lengthy sentence"); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *1-2 (10th Cir. Mar. 29, 2021) (holding that a district court would have authority to grant relief where the defendant sought relief from a sentence that had been upheld on direct appeal and withstood collateral attacks).

Mr. Young appealed his lengthy 240-month sentence, filing his brief after this Court's sentencing of co-defendant Aljermiah Mack, who was charged with and convicted of distributing the same drug substances as Mr. Young, *which both men acquired from the same source: the conspiracy's sole supplier Kristian Cruz*. Mack, however, received a sentence 36 months lower than Mr. Young's, despite (1) Mack's Criminal History Category three levels higher, (2) no 3-level reduction for acceptance of responsibility for Mack, and (3) an enhancement for Mack's leadership role in the conspiracy.

The gross disparity in their sentences was on account of two findings that this Court made *after* Mr. Young's sentencing, but which it based on facts established *before* his sentencing: (1) that the *quantity of fentanyl analogue* that Cruz distributed to the co-conspirators (including Young and Mack) *was unquantifiable*; and (2) that Cruz had *stopped distributing fentanyl analogue before the Guidelines enhancement for fentanyl came into effect*. In light of these findings, at Mack's sentencing following a jury trial where he was *convicted of distributing fentanyl analogue*, this

48

Court <u>defaulted to the base offense level for *heroin*</u> (of which the jury also convicted
him of distributing) and <u>rejected the 4-level fentanyl-misrepresentation
enhancement</u>.

*That Mr. Young was not also sentenced for heroin instead of fentanyl
analogue (which would have led to his Guidelines range nearly 100 months lower
than the sentence he received)* – that co-defendants across the conspiracy were not
treated the same on account of the timing of their sentencing hearings – *is an
extraordinary and compelling reason to support a reduction in sentence. See, e.g.*,
*United States v. Lopez*, No. 11-cr-568 (PKC), 523 F.Supp.3d 432, 438 (S.D.N.Y.
Feb. 26, 2021) (holding that "the significant error in [the defendant's] Guidelines
calculation[] and the absence of any other avenue to correct th[e] error constitute[s]
an 'extraordinary and compelling reason' for sentence reduction"); *United States v.
Ford*, 536 F.3d 848, 855 (D. Kan. 2021) (finding extraordinary and compelling
reason to grant motion for sentence reduction where Ford's co-defendants, "who had
similar involvement in the conspiracy" and went to trial, received lower sentences
for the same quantity of cocaine as Ford who entered a guilty plea); *United States v.
Cano*, No. 95-cr-481, 2020 WL 7415833, at *6 (S.D. Fla. Dec. 16, 2020) (agreeing
with defendant that the disparity in his sentence when compared to the significantly
shorter sentences of the lead defendant and all co-defendants, "is a compelling
reason to grant Defendant compassionate release."); *United States v. Trenkler*, 537

F. Supp. 3d 91, 107 (D. Mass. 2021) ("this court may conclude that a legal error at sentencing constitutes a compelling reason, and reduce the sentence after conducting an individualized review of the case"); *United States v. Wahid*, No. 1:14-cr-14, 2020 WL 4734409, at *3 (N.D. Ohio Aug. 14, 2020) (granting compassionate relief where the defendant was classified as a career offender and subsequent case law clarified that classification was in error).

a. Aaron Young and Aljermiah Mack:
   Virtually Identical Charges and PSR Guidelines Ranges

The Government charged both Mr. Young and Co-Defendant Mack with one count of racketeering (with drug distribution as a predicate act), and one count of substantive distribution. *See* No. 18-cr-834, Dkt. 91 ("Young Indict. S-6"); Dkt. 254 ("Mack Indict. S-11"). The racketeering language was identical in both superseding indictments, and the controlled substances that the Government alleged were the same for both men: heroin, fentanyl, furanyl fentanyl, MDMA, dibutylone, and marijuana. *Id.*

On April 19, 2019, Mr. Young pled guilty pursuant to plea agreement to the racketeering count only, admitting to the distribution of fentanyl analogue. Dkt. 177 at 21. We note that he did *not* allocute as to quantity. On October 3, 2019, Mack was convicted at trial of both the racketeering and substantive narcotics trafficking counts, the jury finding that he distributed fentanyl analogue as well as at least one kilo of heroin. *See* Dkt. 470 ("Mack Sent'g TR") at 12-13.

The Government's and the PSR's calculations for both men *were the same* (except for the quantity of drugs attributed to each, and the 4-level leadership enhancement for Mack):  **(1)** base offense level for fentanyl analogue – level 38 for Mr. Young's 9 kilos and level 34 for Mack's 1-3 kilos (U.S.S.G. § 2D1.1(c)(1) & (c)(3) respectively); **(2)** 4-level enhancement for mispresenting a substance containing fentanyl (§ 2D1.1(b)(13)); and **(3)** a 2-level enhancement for gun possession connected to the narcotics conspiracy (§ 2D1.1(b)(1)).  *See* PSR ¶¶ 82-88 (and Young Plea Agreement at 4-6); Dkt. 470 ("Tr. of Mack Sent'g") at 12.  The resulting sentencing range for Mr. Young was 360 months to life reduced to the 240-month statutory maximum (PSR ¶ 140); and for Mack, at his significantly higher Criminal History Category (VI), the range was life (Dkt. 470 at 7).

On December 2, 2019, this Court sentenced Mr. Young for the distribution of 9 kilos of *fentanyl analogue*.  Dkt. 403 at 5-6.  On February 24, 2020, this Court sentenced Mack for the distribution of 1 kilo of *heroin* – rejecting the PSR and Government's proposed use of *fentanyl analogue* because of lack of proof as to the quantity *the conspiracy distributed* – which reduced the Government's proposed total offense level of 38 by 8 levels (base offense level from 34 to 30; and the 4-level fentanyl-misrepresentation enhancement discarded).  *See* Dkt. 470 at 12-16.

Were Mr. Young similarly sentenced for heroin, *his adjusted offense level would have been 10 levels lower* (base offense level reduced from 38 to 32 for 9

kilos, and the 4-level enhancement discarded).  Or, were he sentenced for an *indeterminate* amount of fentanyl analogue, his adjusted offense level would have been even lower still.

### b. Aaron Young and Aljermiah Mack:  Heroin-Fentanyl Findings

Three factors preface our argument that this Court's heroin-fentanyl findings at Mack's sentencing apply equally to Mr. Young for purposes of this compassionate release motion.  <u>First</u>, this Court knew and advised Government counsel that facts proved at Mack's trial might affect co-defendants' sentencings and so *must* be brought to the attention of all defense counsel.  Specifically, at the sentencing of Co-Defendant Jones *on October 17, 2019*, when discussing Cooperating Witness Kristian Cruz's testimony from the Mack trial *about mixing heroin and fentanyl*, the Court advised Government counsel as follows:

> [PROSECUTOR] LONGYEAR: . . . .  It's heroin, and Mr. Cruz had testified about mixing heroin and fentanyl, and furanyl fentanyl in his drugs, and Mr. Jones was responsible for participating in the distribution. . . .
>
> THE COURT:  One thought just for further sentencings. Just to avoid any delay during the proceeding, *to the extent that there are facts that were developed at trial <u>that aren't in the presentence report</u>, for future <u>defendants</u>* I'd ask you to identify for defense counsel the <u>additional facts that you believe the Court should be considering from the trial</u>, and at the sentencing have a letter exchange with them. Hopefully, you can agree on the facts or isolate any disputes, and that way it will expedite the sort of colloquy that we're having today.

Dkt. 364 ("Sent'g Tr. of Co-Def. Jones") at 21-22 (italics and underline added).

Second, Mr. Young was one of those "future defendants," but Government counsel did *not* identify for defense counsel the "additional facts" developed at trial, that is, that the amount of fentanyl analogue Kristian Cruz supplied to the conspiracy was literally incalculable.

Third, both Mr. Young's and Mr. Mack's Guidelines ranges were driven by the narcotics trafficking conduct. And both Mr. Young's and Mr. Mack's narcotics offense conduct was linked with, subordinate to, and fully contingent upon, the narcotics operation led by cooperating Co-Conspirator Kristian Cruz.

### c.  Base Offense Level:  Heroin Not Fentanyl Analogue

At his sentencing, Mack challenged the quantity of fentanyl analogue the Government and the PSR attributed to him, arguing that it lacked evidentiary support. Dkt. 420 ("Mack Sent'g Memo") at 4. At his sentencing hearing, this Court began by noting that the "quantity of fentanyl analogue" was an issue "for the Court to resolve by a preponderance of the evidence," it was not a question for the jury. Dkt. 470 at 12-13. (Similarly, for Mr. Young, the question of fentanyl analogue was an issue for the Court to determine, not the parties to determine in a plea agreement, nor the Probation Office in its PSR. *See United States v. Leonard*, 844 F.3d 102, 104-05 (2d Cir. 2016) (concluding that applicable Guidelines range was one calculated by court, not that agreed to by parties in 11(c)(1)(C) agreement)).

This Court then gave its reasons for agreeing with defense counsel that the base offense level for heroin, not fentanyl analogue, must be used:

> Having reviewed the trial record, the Court cannot reliably so find [the quantity of fentanyl analogue], although it is certainly a possibility. . . .
>
> And while *the record* comfortably supports a finding that at least some of the mixtures and substances containing heroin that Mack possessed and distributed also contained fentanyl, it *does not offer guidance to the Court as to the quantity of substances containing fentanyl that <u>Cruz sold in connection with the Nine Trey narcotics conspiracy</u>. . .*.
>
> Accordingly, given the <u>*indeterminate* record as to the *quantity of fentanyl*</u> . . . the Court applies a base offense level *keyed to [one kilo of] heroin sales* of 30 under Section 2D1.1(c)(5).

Dkt. 470 at 13-14 (italics and underline added).  This Court stated later in the sentencing proceeding:

> If your point is that Cruz had a drug dealing operation that's independent of the gang, sure, but *I'm focusing really on what Cruz brought to the gang*, which was clearly some drug dealing that included both heroin *and, although the quantity is a little <u>elusive</u>, some fentanyl too*.

*Id.* at 42 (italics and underline added).  The Court came back to this issue toward the end of the proceeding:

> [The gang] also sold fentanyl, although the trial record, as I said earlier, *<u>doesn't allow me to quantify</u>* quite how much.

*Id.* at 69 (italics and underline added). Accordingly, this Court rejected setting 34 as the base offense level for Mack's distribution of more than one kilo of fentanyl analogue as the Government and PSR had calculated pursuant to U.S.S.G. § 2D1.1(c)(3). *Id.* at 12.

*Mr. Young's sentence is undermined by this Court's finding of "indeterminate" and "elusive" quantities of fentanyl*, which Cruz "brought to the gang" and "sold in connection with . . . the narcotics conspiracy," because <u>all of Mr. Young's drug distribution was subsumed within that of Cruz's</u>, the Government explicitly having held the two men responsible for the same amount: "Aaron Young assisted CW-1 [Cruz] in delivering heroin, fentanyl, and fentanyl analogue. . . . In total, Young and CW-1 [Cruz] distributed at least 9 kilograms of fentanyl analogue." PSR ¶ 56; *see also* Dkt. 403 ("Sent'g Tr. of Young") at 8 (Government characterizing Mr. Young as Cruz's "right-hand man").

*Had Mr. Young's counsel known that at trial – before Mr. Young's sentencing – the Government did not establish the quantity of fentanyl Cruz "brought to the gang," then he like Mack's attorney would have had a good faith basis to challenge the quantity the Government and PSR attributed to Mr. Young.* (At his plea hearing, <u>Mr. Young did *not* allocute to any amount of fentanyl analogue he distributed with Nine Trey</u>; *nor* did the Government advise the Court of what amount it could prove were the matter to go to trial. *See* Dkt. 177 at 21.) And this Court was not bound

55

then, nor now, to accept the Government's and Probation Officer's calculations.  *See Leonard*, 844 F.3d 104-05, *supra*.

Moreover, Cruz – who was charged and pled guilty to distributing 400 grams of fentanyl analogue with the Nine Treys *beginning in 2013* – stopped importing and distributing drugs after his arrest on state charges and release on bail *in March 2017*. *See* No. 18-cr-249, Dkt. 34 ("Cruz Sup. Ind.") at 4-8; No. 18-cr-249, Dkt. 18 ("Tr. of Cruz Arraign.") at 32, 34 (discussing his March 2017 arrest and release); No. 18-cr-834, Dkt. 348 ("Cruz Testimony at Mack Trial") at 1229 (testifying that he pled guilty to distributing 400 grams of fentanyl analogue).  Although the Government did arrange undercover sting operations for Cruz and a few members of the Nine Treys after August 2017, not one involved Mr. Young.  *See* No. 18-cr-249 ("Tr. of Cruz Sent'g") at 17-18.

Whatever total amount of fentanyl analogue Cruz ultimately did distribute with the Nine Treys, *Mr. Young was necessarily responsible for less*:  Mr. Young's involvement with the Nine Treys began three years *after* Cruz's did, <u>in 2016</u> when he moved back to New York; and his sole source (Cruz) of fentanyl analogue dried up in March 2017.  *See* PSR ¶ 122 ("From 2012 through 2015, Young resided in Hatfield, PA."); *see also* PSR ¶ 125.  Furthermore, according to Cruz himself, in 2016 Joseph Raffone was his right-hand man, not Mr. Young.  It was in Raffone's apartment that Cruz stored his imported drugs, and it was Raffone whom he used

(not Mr. Young) to deliver them to Nine Trey members. *See, e.g.*, Dkt. 346 ("Cruz Test'y at Mack Trial") at 904-907, 912-13; Dkt. 348 at 1029-1030 (same); **Exhibit 9** ("Tr. of Day 7 of Mack Trial") at 1389-91, 1439 (same).

But Mr. Young's attorney *did not know* about the "elusive" quantity of fentanyl that Cruz "brought to the gang," because the Government forgot this Court's explicit directive to advise defense counsel of factors that might impact their clients' sentencings. *See supra*.

Thus, Mr. Young's lawyer went into the December 2019 sentencing relying solely on a September 2, 2019 PSR, which had been rendered obsolete by Mack's September-October 2019 trial. And so Mr. Young's lawyer did not argue to set aside the base offense level 38 for 9 kilos of fentanyl-analogue, nor did he pursue <u>base offense level 12</u> for distribution of an unquantified amount of fentanyl-analogue (see U.S.S.G. § 2D1.1(c)(14)); nor alternatively did he suggest <u>base offense level 32</u>, for distribution of 9 kilos of *heroin* with an indeterminate quantity of fentanyl-analogue mixed in (§ 2D1.1(c)(4)).

### d. <u>Four-Point Enhancement Not Applicable as a Matter of Law</u>

At Mack's sentencing, this Court also reviewed and explained why it was rejecting the four-point enhancement the Government and PSR applied for Mack's misrepresenting a substance containing fentanyl as heroin pursuant to Guidelines § 2D1.1(b)(13):

Second, the Court holds, with Mack, that the four-point fentanyl misrepresentation enhancement does not apply. The government seeks this enhancement pursuant to Section 2D1.1(b)(13). . . .

*Crucially here, by its terms, this amendment was effective as of November 1, 2018.* . . .

Cruz also testified on direct examination that he began cooperating with the government "around May 2018." Transcript at 871.  On redirect Cruz testified that after May 2018, he did not engage in any drug deals or have any drug-related conversations with Mack.  See transcript at 1352.   Indeed, while Mack never withdrew from the narcotics conspiracy, the record is devoid of any evidence that Mack misrepresented a substance containing fentanyl after May 2018, *much less after the amendment's effective date of November 1, 2018.*

The Court cannot comfortably, under these circumstances, find that a *guidelines enhancement that only became effective six months later applies*.  Accordingly, the Court does not apply the four-level enhancement for fentanyl misrepresentation.

Dkt. 470 at 14-16 (italics added).

The 4-level enhancement similarly should not have applied to Mr. Young, as his activities were defined by Cruz's distribution of fentanyl analogue (see PSR ¶ 56), and Cruz's distribution ended at least six months *before* the fentanyl-misrepresentation Guideline came into effect (see *supra*).   Significantly, Mr. Young's PSR actually referred to Cruz's activities as ending in early 2018, but neither Probation, Government counsel, Mr. Young's counsel, nor this Court made the connection to the November 2018 effective date of the enhancement.  *See* PSR

¶ 53 ("Between 2015 and *early 2018*, a cooperating witness [Kristian Cruz] possessed and distributed several dozen kilograms of . . . heroin, fentanyl, and fentanyl analogue.") (italics added); PSR ¶ 56 ("Aaron Young *assisted CW-1 [Cruz]* in delivering heroin, fentanyl and fentanyl analogue in Brooklyn and Manhattan.") (italics added).

In *United States v. Lopez*, *supra*, Judge Castel granted in part a motion for compassionate release, reducing the defendant's sentence upon concluding that a sentencing error constituted an extraordinary and compelling reason. Years earlier, and similar to Mr. Young's situation, Judge Castel had adopted without objection the Guidelines range set forth in the plea agreement and recommended by Probation. 523 F. Supp. 3d 434. In his release motion, however, Lopez argued for the first time that there had been an error in finding him to be a "career offender." *Id.* at 438.

The circumstance, Judge Castel wrote, was "truly extraordinary":

> Able defense counsel and a competent prosecutor overlooked that one of the predicate offenses was a simple possession rather than a sale of a controlled substance. The Office of Probation on its own review thought the crime constituted a second qualifying offense under section 4B1.1 of the Guidelines. The undersigned, who bears the ultimate responsibility, did not detect that one of the two offenses was non-qualifying.

*Lopez*, 523 F. Supp. 3d at 438.

In overruling the Government's objection to reducing Lopez's sentence, Judge Castel acknowledged the strong federal interest in the finality of judgments, but found two factors that made the case distinctive:

> First, the Guidelines error is one that the government and the Court *should have detected at or prior to sentencing* and allowing the sentence to stand *undermines respect* for the judicial process. . . . Second, the Guidelines *error was substantial*. . . .  Instead of the range of 262 to 327 months' imprisonment that the Court adopted, it should have adopted a range of 121 to 151 months' imprisonment.

*Id.* at 438-39 (italics added).  Citing *Brooker*'s directive to consider all reasons for compassionate release, including the injustice of a lengthy sentence, and finding no other avenue to correct the sentencing error, Judge Castel reduced the sentence to 121 months.  *Id.* at 438, 442.

The very same rationale applies to Mr. Young's case, where there is no other avenue to correct sentencing error.   At or prior to Mr. Young's sentencing, all involved should have caught the effective date of the fentanyl-misrepresentation enhancement.  Certainly, this Court caught it at or prior to *Mack's* sentencing.  *See* Dkt. 470 at 15.

Similarly, *after* the month-long trial of Mr. Young's co-conspirators, *and at or prior to Mr. Young's sentencing*, the Government should have conceded and the Court might have detected that the Government had no evidence to establish that Mr. Young and Cruz distributed nine kilos of fentanyl analogue.  Certainly, Mack's counsel caught that and persuaded this Court that it was impossible to know from

Cruz's testimony how much fentanyl analogue *he and the conspiracy* (not simply Mack) distributed.  And if Cruz was unable to testify to quantity *at trial*, he certainly would not have been able to testify to quantity at a *Fatico* hearing to support a finding of 9 kilograms, had Mr. Young's counsel known to ask for one following the trial.

e.  Re-Calculating Mr. Young's Guidelines Range

In initially calculating Mr. Young's range, both the PSR and the Government in its plea offer letter calculated the adjusted offense level for the RICO narcotics predicate to be 44:  base offense level 38 for 9 kilos of fentanyl analogue, enhanced 4 levels for mispresenting fentanyl and 2 levels for gun possession.  *See* Plea Agreement at 2-4; and PSR ¶¶ 82-88.

Re-calculating Mr. Young's range for 9 kilos of *heroin*, with an indeterminate amount of fentanyl analogue mixed in, the adjusted offense level would now be 34:  base offense level 32 for 3.0-9.99 kilos of heroin (U.S.S.G. § 2D1.1(c)(4)), no enhancement for misrepresenting fentanyl, and 2 levels added for gun possession.[15] (Or, if re-calculating for an *unspecified amount of fentanyl analogue* – no quantity

---

[15]  This Court rejected this gun enhancement at Mack's sentencing finding that while there was evidence he possessed a gun in relation to his violent conduct in furtherance of the conspiracy, any conclusion that the gun possession was connected to the narcotics, which was based on Cruz's testimony alone, "would require speculation beyond what the trial record reliably shows."  (Dkt. 470 at 17)  We note, similarly, that at Mr. Young's plea colloquy, he admitted to use of a gun in the attempted murder, *but he did not allocute to possessing a gun in connection to the narcotics*; and, similarly, any conclusion that he possessed a gun in connection to the narcotics was based on Cruz's testimony alone.  Arguably, then, this two-level enhancement could also fall away.

having been allocuted or proven – the base offense would be 12 (§ 2D1.1(c)(14)), plus 2 for the gun, for a total adjusted offense level of 14.)

Continuing with the calculations, the adjusted offense level for the RICO narcotics predicate is grouped with the adjusted offense level of 35 for the predicate attempted murder of an individual known as "Snow." *See* PSR ¶ 81. When grouping, one unit is assigned to the group with the highest offense level (35), and one additional unit is assigned to any group that is 1 to 4 levels lower. *See* U.S.S.G. § 3D1.4; *see also* PSR ¶ 89. Because the level for 9 kilos of heroin (34) is one level lower, this second unit is added. Thus, here there are a total of two units, which means that two levels are added to the higher offense level (35) to find the combined adjusted offense level: 35 + 2 = 37. (If re-calculating for an *unspecified amount of fentanyl analogue* the second grouping unit would not be added, because the adjusted offense level 14 is more than four levels lower than 35; thus, the combined adjusted offense level would be 35 + 1 = 36.)

Finally, on account of his timely accepting responsibility through his guilty plea, 3 levels are subtracted pursuant to U.S.S.G. § 3E1.1(a)&(b). *See* PSR ¶¶ 94-95. Thus, Mr. Young's total offense level would be 34 (or 33 if using adjusted offense level 36). Under this re-calculation scenario, it is now the attempted murder of Snow that drives Mr. Young's Guidelines level, which this Court has made clear

was the reason it imposed a significantly longer sentence on Mr. Young than any other co-defendant. *See* Dkt. 403 at 29.

With regard to criminal history, both the Government and defense counsel calculated Mr. Young's Criminal History Category ("CHC") – which consisted solely of three New York 5th degree misdemeanor marijuana possession convictions (PSR ¶¶ 101, 105, 106), and two unspecified 7th degree drug possession convictions (PSR ¶¶ 103, 104) – at level II. The PSR calculated it at III.

Defense counsel challenged the level III on the basis of the marijuana convictions. *See* Dkt. 366 at 3-4. This Court adopted the PSR's level III determination, *without addressing the objection*, concluding that the level did not matter because the 240-month statutory maximum sentence was below the Sentencing Guidelines range whether calculated for CHC level II or level III. *See* Dkt. 403 at 6-7. Since his sentencing, New York no longer prosecutes the simple possession of marijuana and, as of August 28, 2019, prior 5th degree convictions are automatically (and retroactively) expunged.[16] Accordingly, Mr. Young has only two criminal history points, for his 7th degree misdemeanor possession offenses (PSR ¶¶ 103-104), and would be at the bottom of Criminal History Category II.

---

[16] *See* New York State Criminal Procedure Law §160.50(3)(k)(ii) and (5)(a), as amended, and New York State Penal Law §221.05 and §221.10 as amended.

For Mr. Young's total offense level 34 at CHC II, the sentencing range is 168-210 months. (If re-calculating using an *unspecified amount of fentanyl analogue* the sentencing range would be 151-188 months for total offense level 33 at CHC II.)

Just as in *Lopez*, allowing the errors to stand would undermine respect for the judicial process, and the errors – which resulted in a grossly disparate sentence for Mr. Young – were substantial. Instead of the 240-month range that this Court adopted, it should have adopted a range roughly 70 to 90 months less. Without any other avenue to rectify the sentencing discrepancies, this Court should reduce Mr. Young's sentence on this motion for compassionate release, in light of all the other extraordinary and compelling reasons.

## C. **18 U.S.C. Section 3553(a) Factors Support a Sentence Reduction**

Upon finding that Mr. Young's circumstances are sufficiently "extraordinary and compelling" to warrant a reduction in sentence, the Court must also consider whether the factors set forth in § 3553(a), as "viewed in combination from the vantage point of today," favor such a reduction. *See Phillibert*, *supra*, No. 15-cr-647 (PAE), 2021 WL 3855894, at *2, *6.

The Section 3553(a) factors, all of which we discuss below, include "the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect

64

the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities." *Brunetti*, 01-cr-257 (JFK), 2022 WL 92753, at *3 (citing *United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020) (quoting 18 U.S.C. § 3553(a))). Section 3553(a) also directs that courts shall consider the need for the sentence imposed "to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D).

1. The Characteristics of the Defendant Are Remarkably Altered (§ 3553(a)(1))

The BOP's 22-month delay in testing for and diagnosing diabetes has irreparably altered Mr. Young's life forever and for the worse. Allowing the disease to progress as it did, he will require twice daily insulin injections for the rest of his life (likely to increase over time), as well as a daily regimen of oral insulin medication, and constant self-monitoring and visual observation, which he is unable to perform on account of prior physical impairment. He is also physically a different man, weakened, tired, prone to severe pain, and hobbled by disease, virtually tethered to a toilet.

Not only was the harm the BOP caused him unforeseen by the Court when originally weighing the § 3553(a) factors, but his disease and poorer physical condition make him much less likely to recidivate, and more likely to die younger than he otherwise would have. In two words, Mr. Young's characteristics have

"altered remarkably" since the time of his original sentencing and support compassionate release.

2. <u>Mr. Young Has Served a Sufficient Percentage of His Sentence to Satisfy the Public's Interest in Punishment and Deterrence (§ 3553(2)(A) and (B))</u>

Were this Court to originally impose sentence today, we believe it would be at or below the bottom of the re-calculated Guidelines range, just as this Court did when originally sentencing the other Nine Trey co-conspirators.

This Court sentenced Co-Defendants Mack and Ellison (who both went to trial), and Lovick, Walter, Martin, and Denard Butler to *below-guideline sentences*; and it sentenced Jones (the godfather), Jordan, and Jesnel Butler to the *bottom of their respective ranges*. (Only one of the 13 co-conspirators, McKenzie, received a sentence within the Guidelines range. And the remaining two, Cruz and Hernandez, received sentences commensurate with their substantial assistance.) Nobody received an above-Guidelines sentence.

It is clear from undersigned counsel's review of all the sentencing hearing transcripts that, in imposing below or bottom-of-the-range Guidelines sentences, acceptance of responsibility "made a real difference" to this Court; "difficult childhoods" were profoundly significant; and family and friend testimonials counted very much in the defendants' favor. This Court found these same three mitigating factors for Mr. Young. *See* Dkt. 403 ("Tr. of Young Sent'g") at 27-29.

This Court found additional mitigating factors when sentencing the co-defendants – all of which support a below-Guidelines sentence for Mr. Young – including: (1) shorter criminal histories (J. Butler, Lovick, Young)[17]; (2) no prior adult history of violence (J. Butler, Walter, Young)[18]; (3) injuries suffered after the acts for which the defendant was being punished (Walter, Young)[19]; (4) constructive steps toward self-improvement by taking prison courses (D. Butler, Lovick, Mack, Young)[20]; (5) a non-leader, non-decision-making role (D. Butler, J. Butler, Young)[21]; and (6) the current sentence would be by far the longest sentence the defendant had ever received and defendants would be in their late 50s when released (Jordan, Walter, Young)[22].

Presuming no downward variance for Mr. Young, but a sentence at the low end of the Guidelines range, 168 months (or 151 months), with 12 months' credit for the prison drug treatment program (RDAP) and a 15% reduction for Good Time

---

[17] *See* J. Butler sentencing transcript, Dkt. 248 at 19; Lovick sentencing transcript at 30; Young PSR ¶ 98-106 (5th and 7th degree misdemeanor drug possession convictions, three of them expunged).

[18] *See* J. Butler, Dkt. 248 at 20; Walter sentencing transcript, Dkt. 300 at 37; Young, PSR ¶ 98-106.

[19] *See* Walter, Dkt. 300 at 38; Young, PSR ¶ 126.

[20] *See* D. Butler sentencing transcript, Dkt. 433 at 31; Lovick sentencing transcript at 27-28; Mack sentencing transcript, Dkt. 470 at 83; Young, **Exhibit 10** (certificates for prison courses and mandatory drug education that Mr. Young has completed).

[21] *See* D. Butler, Dkt. 433 at 25; J. Butler, Dkt. 248 at 19; Young, PSR ¶ 61.

[22] *See* Jordan sentencing transcript, Dkt. 329 at 22-23; Walter, Dkt. 300 at 37; Young, PSR ¶¶ 98-99.

Credit, Mr. Young would be eligible for release after approximately 131 months (or 116 months).

Mr. Young has been incarcerated since his arrest on December 19, 2018 (approximately 41 months ago), satisfying approximately one-third of the re-calculated sentencing ranges.  When accounting for what will be <u>a lifetime of insulin dependency</u> (and all of the inconvenience and associated anguish), and <u>a reduced lifespan</u> – *as a direct cause of the BOP's failure to timely test and diagnose Mr. Young's medical conditions before they became acute, as well as the BOP's failure to adequately and properly treat his conditions once diagnosed* – and <u>20 months spent at MCC and MDC</u> for which courts have been giving defendants 1 day to 1½ days of credit for every day served, *releasing Mr. Young now* to allow him to begin a proper updated course of insulin treatment, in an environment where he is better able to protect himself from COVID, will satisfy the public's interest in fair and just punishment.

3. <u>The Nature and Circumstances of the Offense – Reconsidered in Light of Kristian Cruz's Trial Testimony – Support a Finding that Mr. Young Will Neither Recidivate Nor Endanger the Public (§ 3553(1) and (2)(C))</u>

Having read this Court's many decisions *granting* compassionate release, and many of its decisions *denying* release, the linchpin underlying all of the decisions – the factor that might outweigh the most serious of medical conditions – is the Court's desire to protect the community, pursuant to § 3553(a)(2)(C).  That is, whether the

68

particular defendant will likely recidivate and be a danger, if released on compassionate grounds before he has served his full punishment.  Mr. Young will not.

In looking to this conspiracy specifically, eight of Mr. Young's co-defendants have filed motions for compassionate release.  This Court has found that potential danger to the community outweighed grounds for the immediate release of all of them but one, Daniel Hernandez.

The following comparative summary review of the acts of violence of those eight co-defendants – together with the health conditions they alleged in their motions for compassionate release – strongly supports the finding that Aaron Young, like Daniel Hernandez, is no longer a danger and will not recidivate:

> **Kifano Jordan** ("one of the highest-ranking members" of the Nine Trey) – who alleged hypertension, stress, selective antibody deficiency – participated in the following acts of gang-related violence with co-conspirators *Hernandez, Martin, Denard and Jesnel Butler, Walter, Ellison and Lovick* (but never with Aaron Young):
>
> (1) the **November 2017 assault** of rap artists at a New York hotel;
> (2) the **March 20, 2018 retaliatory shooting** in Times Square – Jordan fired five rounds into an occupied van;
> (3) the **April 3, 2018 robbery** in Times Square;
> (4) the **April 21, 2018 shooting** outside a restaurant in Brooklyn – "Jordan took out a gun, opened the door to the car and punched one of the individuals in the face. . . .  As they were driving down a one-way street, Jordan got out of the car and *shot at the trailing vehicle*";
> (5) the **April 21, 2018 shooting** at the Barclay's Center;

69

(6) the **June 2, 2018 shooting** at the W Hotel in Times Square;

(7) the **July 16, 2018 shooting** where an innocent bystander was struck in the foot;

(8) the **October 26, 2018 assault** on a retired NYPD officer at a restaurant on Madison Avenue; and

(9) the **shooting of five people in one night** for Nine Trey godfather Mel Jones.

*See* Dkt. 516 ("Order Denying Compassionate Release"); Dkt. 288 ("Gov't Sent. Ltr."), at 1-4; *see also* Dkt. 381 ("Gov't 5K1.1 Ltr." for Hernandez), at 3, 5; Dkt. 351 ("Mack/Ellison Trial Tr."), at 1530-31.

**Roland Martin** (high-ranking member) – who alleged asthma, and a previously punctured lung – participated in the following acts of gang-related violence with co-conspirators *Hernandez, Jordan, both Butlers, Walter, and Lovick* (but never with Aaron Young):

(1) the **March 20, 2018 retaliatory shooting** in Times Square;

(2) the **April 3, 2018 robbery** in Times Square;

(3) the **April 13, 2018 shooting** of Mack in Brooklyn;

(4) the **April 21, 2018 shooting** at the Barclay's Center; and

(5) the **July 16, 2018 shooting** where an innocent bystander was struck in the foot.

*See* Dkt. 465 ("Order Denying Compassionate Release"); Dkt. 323 ("Gov't Sent. Ltr."), at 2-3.

**Denard Butler** (member) – who alleged asthma and bradycardia – served more than a decade in prison for first degree robbery and possession of a loaded firearm, participated in the following acts of gang-related violence with co-conspirators *Hernandez, Jordan, Martin, Jesnel Butler, Walter, and Lovick* (but never with Aaron Young):

(1) the **March 20, 2018 retaliatory shooting** in Times Square;

(2) the **April 3, 2018 robbery** in Times Square;

(3) the **April 13, 2018 shooting** of Mack in Brooklyn; and

(4) the **April 21, 2018 shooting** at the Barclay's Center.

*See* Dkt. 461 ("Order Denying Compassionate Release"); Dkt. 412 ("Gov't Sent. Ltr.") at 2.

**Jesnel Butler** (member) – who alleged mild asthma, seizures, prediabetes, and obesity – participated in the following acts of gang-related violence with co-conspirators *Hernandez, Jordan, Martin, Denard Butler, Walter, and Lovick* (but never with Aaron Young):

> (1) the **April 3, 2018 robbery** in Times Square;
> (2) the **April 21, 2018 shooting** at the Barclay's Center; and
> (3) the **July 16, 2018 shooting** where an innocent bystander was struck in the foot.

*See* Dkt. 520 ("Order Denying Compassionate Release"); Dkt. 216 ("Gov't Sent. Ltr.") at 1-2.

**Faheem Walter** (member) – who alleged after-effects of a gunshot wound – participated in the following acts of gang-related violence with co-conspirators *Hernandez, Jordan, Martin, both Butlers, and Lovick* (but never with Aaron Young):

> (1) the **April 3, 2018 robbery** in Times Square;
> (2) the **April 21, 2018 shooting** at the Barclay's Center;
> (3) the **July 16, 2018 shooting** where an innocent bystander was struck in the foot; and
> (4) the **October 26, 2018 assault** on a retired NYPD officer at a restaurant on Madison Avenue.

*See* Dkt. 469 ("Order Denying Compassionate Release"); Dkt. 246 ("Gov't Sent. Ltr."), at 1-2.

**Anthony Ellison** (a leader within Nine Trey) – who alleged asthma – participated in the following gang-related violence with co-conspirators *Hernandez and Jordan* (but never with Aaron Young):

> (1) the **November 2017 assault** of rap artists at a New York hotel;
> (2) the **February 2018 brawl** at a Los Angeles airport;

(3) the **July 22, 2018 armed kidnapping and robbery** of co-conspirator Daniel Hernandez; and

(4) the **October 24, 2018 slashing of an individual's face** from ear to chin.

*See* Dkt. 602 ("Order Denying Compassionate Release").

**Fuguan Lovick** (associate) – who alleged no medical conditions – participated in the following gang-related violence with *Hernandez, Jordan, Martin, both Butlers, and Walter* (but never with Aaron Young):

(1) the **April 21, 2018, shooting** at the Barclay's Center – Lovick fired a weapon in a crowd.

*See* Dkt. 530 ("Order Denying Compassionate Release").

**Daniel Hernandez** (rap artist who joined Nine Trey) – who alleged asthma – committed numerous acts of violence *on his own*, including an assault in Times Square; an assault on a 16-year-old in Houston; domestic violence; solicitation to commit murder for $50,000; and, most reprehensibly, he *filmed and publicly distributed a child pornography video* depicting a 13-year-old girl performing sex acts on two men, a video in which Hernandez himself also appeared. Dkt. 381 ("Gov't 5K1.1 letter"), at 6-8.

At his original sentencing, this Court characterized Hernandez's conduct as "violent," "sustained," "destructive," "selfish," and "reckless." Dkt. 395 ("Sent. Tr.") at 60. Hernandez participated in the following gang-related violence with his Nine Trey co-conspirators *Jordan, Martin, both Butlers, Walter, Ellison, and Lovick* (but never with Aaron Young):

(1) the **November 2017 assault** of rap artists at a New York hotel;

(2) the **February 2018 brawl** at a Los Angeles airport;

(3) the **March 20, 2018 retaliatory shooting** in Times Square;

(4) the **April 3, 2018 robbery** in Times Square;

(5) the **April 21, 2018 shooting** outside a restaurant in Brooklyn;

(6) the **April 21, 2018 shooting** at the Barclay's Center;

(7) the **June 2, 2018 shooting** at the W Hotel in Times Square; and

(8) the **July 16, 2018 shooting** where an innocent bystander was struck in the foot.

*See* Dkt. 381, at 4-6; Dkt. 451 ("Order Granting Compassionate Release").

**Aaron Young** (associate) – who has provided evidence of acute insulin-dependent diabetes, hyperlipidemia, hypertension, obesity – participated in the following single act of gang-related violence, with co-conspirator *Kristian Cruz*:

(1) the **January 19, 2018 shooting** of Kristian Cruz's rival "Snow" who was struck by a bullet in the neck.

*See* PSR ¶ 33; and *compare* PSR ¶ 33 (Young's violence) to PSR ¶¶ 34-52 (violence of co-defendants).

In granting Daniel Hernandez's motion for compassionate release after he served 17 months of a 24-month sentence – the only such grant for this group of co-conspirators – this Court wrote that it was "persuaded" that, on account of Hernandez's public cooperation against members of Nine Trey, he "no longer will present meaningful danger to the community if at liberty." Dkt. 451 at 7.

*Cooperation*, not past violence committed – because Hernandez was brutal – appears to be the determinative factor to date in deciding whether any Nine Trey co-conspirators merit compassionate release.

Mr. Young's case should be the exception to that trend. (Aaron Young did not cooperate because, as the lowest associate of the gang, he had no substantial information to offer the Government. His role in the gang hierarchy was so *de*

*minimis*, that but for the cooperation of Kristian Cruz, the Government admitted it never would have known of his involvement:  "Frankly, with Aaron Young, there wasn't even a body to breathe oxygen into before Mr. Cruz came and cooperated." No. 18-cr-249, Dkt. 37 ("Tr. of Cruz Sent'g"), at 20 (AUSA speaking).)

Mr. Young was the only person associated with the Nine Treys who *never* participated in any of the marauding forays to public venues.  *See* PSR ¶¶ 34-49.  He did not tag along with Hernandez, Jordan, Martin, either Butler, Ellison, nor Lovick, to commit mayhem and threaten the public, because he was not "one of the gang," because he was not involved at all with *the enforcement side* of the gang, *and because he had never had anything to do with violence in his entire 38 years of life.*

Mr. Young's history was very different than that of all the other co-conspirators, and he in fact did not associate with the conspiracy until three years *after* the charged start in 2013.  In 2016, when Mr. Young moved back to New York after many years in Pennsylvania, he met up with a friend and big-brother figure from back when he grew up in the infamous Marcy Projects in Brooklyn, the gang's now-godfather Jamel Jones.  And Jones helped him out.

Mr. Young had no steady legal employment and was living on his life-long SSI disability benefits.  *See* PSR ¶ 134.  Nobody legitimate would offer Aaron Young a job because he was slow, mentally retarded, an IQ of 63.  *See* Def. Sealed Sent'g Ex. Dkt. 366-1 ("Expert Report of Mandal") at 8.  He was mentally retarded

because he was born 1.6 pounds to a drug-addicted mother and spent the entire first year of his life in the hospital on life-support.  *See id.* at 3.

And Mr. Young remained developmentally challenged because when he was a child, nobody saw to getting him special programming.  Nobody saw to helping him because, for his first ten years of life, his guardians were his drug-addled parents and they, instead, physically and psychologically abused him and his siblings, locking them in the bedroom they shared for days at a time, depriving them of food, clothing, water, electricity in the apartment, and, in Mr. Young's case, beating him and once breaking his arm.  *See id.* at 3-6; PSR ¶¶ 113-117.

At age ten, he continued disserved, as Social Services put him into the care of an aunt and uncle who physically abused and sexually molested him instead of helping him.  He became a run-away, sleeping on building rooftops; and he dropped out of high school, never achieving proficiency above the elementary-school level. *See* Dkt. 366-1 "Mandal Report" at 6-7; PSR ¶ 118.

And yet, Mr. Young did not grow up to be "a thug from the Projects."  He grew up mild-mannered and shy on account of his slowness.  Mr. Young avoided drugs – though he became a life-long daily cigarette and marijuana smoker – and ultimately got himself out of the Marcy Projects, and New York, starting a life with his girlfriend and their child in Pennsylvania.  Ultimately, he and his girlfriend separated and Mr. Young returned to Brooklyn where his siblings lived, though he

often went back to Pennsylvania to visit his young daughter, his former girlfriend, and her parents with whom he was close.  *Id.* PSR ¶¶ 120, 122.

Back in Brooklyn *in 2016* (PSR ¶ 122), then 36 years old, his long-ago friend Jamel Jones, the Nine Trey godfather, eventually introduced him to 20-year-old Kristian Cruz, who had been supplying the Nine Treys with fentanyl-laced heroin *since 2013*.  *See* No. 18-cr-249, Dkt. 34 ("Cruz Sup. Indict.") at ¶ 14.  Cruz could always use people to package baggies of heroin for him.

In 2018, when the Government discovered Kristian Cruz's drug scheme importing heroin and fentanyl analogue from China – when they had him "dead to rights on narcotics trafficking" – they "flipped" him.  *See* No. 18-cr-249, Dkt. 37 ("Tr. of Cruz Sent'g"), at 8.  Cruz, who the Government did not know was then also deeply involved with the Nine Treys, agreed to cooperate on both fronts.  (The Government already had an active, unrelated investigation of the Nine Treys underway.)  Cruz wore a wire; he recorded conversations; he met secretly with Government agents; he was savvy, resourceful and proactive.  *Id.* at 17, 22, 33.  As a cooperator he was, in a word, "spectacular."

Cruz told the Government that Aaron Young packaged his (Cruz's) heroin, *and he told them that Mr. Young was involved in a shooting*, which is what led to Mr. Young's indictment.  *See* PSR ¶ 33, 56, 61.  Specifically, Cruz told the Government that Mr. Young *had discovered* that a rival in Nine Trey, Shane Hardy

(known as "Snow"), was planning to murder Jones and kidnap Cruz; that Mr. Young *took it upon himself* to premeditatedly plan and carry out the retaliatory shooting of Snow; and that *after* the shooting, Mr. Young *revealed this plot* to Cruz, playing for him "an audio recording in which the victim [Snow] could be heard saying that he intended to murder or otherwise harm or betray several [gang] members." *See* PSR ¶ 33; *see also* Dkt. 348 ("Cruz Trial Testimony, Direct Examination"), at 1134-36.

On Cruz's information alone, the Government charged Mr. Young and included attempted murder as a predicate act in the RICO count against him. *See* No. 18-cr-249, Dkt. 37 ("Cruz Sent'g Tr."), at 20. And Cruz stuck to this *story*, through the time of Mr. Young's April 2019 guilty plea, and all the way *until* he (Cruz) was cross-examined at his co-conspirators' trial in September 2019.

The Government can perhaps be forgiven for not questioning how an individual with an IQ of 63, and only tangentially affiliated with the gang, could possibly have discovered "Snow's" murderous plot against gang members – and then planned a retaliatory shooting ambush – because the Government did not know anything about Mr. Young. All they knew was what Cruz told them, and they took their brilliant cooperator at his word.

But what Cruz told them was not the truth.

Providentially, at the trial of co-conspirators Mack and Ellison, which took place before this Court in September and October 2019, *defense attorneys did not*

77

*take Government witness Kristian Cruz at his word.*  On cross-examination, Cruz

admitted to them that in December 2017, *it was he* (not Aaron Young) who learned

of the recording on which Snow said that he wanted to kidnap him and kill Jones;

that it was *he (Cruz) who invited Snow* to a bar to meet with him and Mr. Young the

night in January 2018 Snow would be shot (not Aaron Young who planned it on his

own); that the site he chose for the meeting was around the corner from where Mr.

Young was living; and that before he met up with Snow, he went to Mr. Young's

apartment (where he played for Mr. Young the recording of Snow threatening Cruz

and Mr. Young's long-time friend Jamel Jones):

> Q. [DEFENSE COUNSEL] Now, **in late 2017**, a recording came out
> by a man by the name of Snow?
>
> A. [KRISTIAN CRUZ]  Yes.
>
> . . .
>
> Q. You claim that Snow was also a member of the, of Nine Trey, true?
>
> A. Yes.
>
> . . .
>
> Q. And so Bat's [Aaron Young's] cousin obtained this video of Snow
> intending to commit these crimes to you, true?
>
> A. It's *not* Bat's cousin.  *Its [sic] Snow's own cousin.*
>
> Q. OK.  Snow's own cousin produced this video to you, this
> recording *to you and Bat* indicating that Snow wanted to kidnap
> you, true?

A. He, Bat's – not Bat's – Snow's cousin *showed* **me** *the recording.*

Q. *So you heard this recording* of Snow supposedly trying to kidnap you and hurt you and rob you, true?

A. Yes.

. . .

Q. The shooting happened **in early 2018**, right?

A. I believe so.

Q. January 2018, true?

A. I believe so.

Q. *You had already obtained the recording* where Snow indicated his intention to shoot you sorry, to kidnap you, right?

A. Yes.

Q. And *you* arranged to bring Snow to the W Hotel in Manhattan, right?

A. No.  I mean, we spoke about meeting up.  When I left the bar [Brooklyn nights] . . . I said:  I'm going home.  Call me later, and we can meet up at the W Hotel.

. . .

Q. *The bar* that you were at was – one of – before the issue of the W Hotel came up, *you were at a place called Brooklyn Nights*, isn't that correct?

. . .

A. Yes.  Snow met me and Bat [Aaron Young] over there, yes. . . .
*Me and Bat were together in Bat's house.*  Bat lives around the corner from Brooklyn Nights . . . .  It's right around the corner from Brooklyn Nights.  So we jumped in a cab.  I went to the cab driver, jumped in a

cab, went all the way to Brooklyn Nights around the corner. Snow was there.  We met up with Snow there.

Q. And you spent time with you, Snow and Bat at Brooklyn Nights, right?

A. True.

Q. And then you leave, true?

A. Yes, by myself.

. . .

Q. And then you meet back up with Bat, right?

A. Yes.

Q. And then you drive him out of town, right?

A. Yes.

Q. Drive him to Pennsylvania?

A. Yes.

**Exhibit 9** ("Tr. of Cruz Test'y at Mack Trial") at 1343-1350[23]; *see also*

**Affirmation** at ¶¶ 70-73.

Cruz learned in December of Snow's plot to kidnap him (Cruz) and waited

until Snow's birthday, January 19, 2018, to "invite[]" him out "to celebrate his

birthday."  *See* PSR ¶ 33.  Cruz – who liked to hang out at the W Hotel bar in

---

[23]  The transcript of trial day 7, September 25, 2019, is the only daily transcript that does not appear on the docket sheet.  The Government provided undersigned with a copy, and pages referred to in this Memo are included in **Exhibit 9**.

Manhattan – invited (lured) Snow to meet him first at a Brooklyn bar located around the corner from the apartment where Mr. Young was living, but he made sure to let Snow know that there were going to be girls meeting them there and afterward they would all continue on to the W Hotel in Manhattan:

> Q. And you arranged to bring Snow to the W Hotel in Manhattan, right?
>
> A. No. I mean, we spoke about meeting up.  When I left the [Brooklyn] bar, there was supposed to be females coming to meet up with us.  *The females were taking too long,* so *I didn't want to hang around a whole bunch of guys,* so I said:  I'm going home.  Call me later, and we can meet up at the W Hotel.
>
> The reason we were going to the W Hotel was because I had my girl at my house so I couldn't have other girls come to my house, so I would meet them at the W Hotel.
>
> Q. The W Hotel is where you liked to hang out and drink, right?
>
> A. I guess so, yeah.

*Id.* at 1345-46 (italics added); *see also* **Affirmation** at ¶ 71.

The females "taking too long" was an excuse Cruz gave to leave Snow alone with Mr. Young *and another associate of theirs*, Kareem Anderson, who Cruz knew to carry and stash guns in his apartment, and who was about to arrive at the bar to celebrate Snow's birthday with them.  *See* **Exhibit 11** ("Police Record of Investigation") at 1, 4 (Shane "Snow" Hardy telling detectives Kareem Anderson was at the bar with them and they were celebrating his birthday)[24]; Dkt. 348 at

---

[24]  Excerpts from the police investigation of the shooting of Shane ("Snow") Hardy, which

1153-1154, 1219-1223 (Cruz testifying about importing drugs to Kareem Anderson's address and knowing he stored guns in that apartment); *see also* **Affirmation** at ¶ 71.

The victim Snow himself, while in the hospital after his shooting, reported to police detectives that he, Kareem and "Dread" left the bar together – Mr. Young had dreadlocks at the time (so did Jamel Jones) – got in a cab to go into Manhattan "to hang out for [his] birthday," but Dread said he needed to stop in Brooklyn.  The cab stopped on the corner of Bedford Place and Brevoort Place, which was about *one mile away from* the bar "Brooklyn Nights" (located 497 DeKalb Avenue at Franklin Avenue), and just a couple of blocks from where Cruz's girlfriend lived with their son.  *See* **Exhibit 11** at 4; *see also* **Affirmation** at ¶ 73.  (NOTE:  The PSR is incorrect that the shooting happened "in an alleyway" "outside the bar." *See* PSR ¶ 33.)

According to Snow, they got out of the cab, talked on the street corner for a moment and then, as Snow was speaking with Kareem, Dread stepped behind him. Snow told the detectives that the next thing he knew, he heard a ringing in his ear and felt pain.  He walked to a nearby gas station, asked for help and was taken to a hospital.  Bullet fragments were removed from his neck, and he gave a statement

---

mention Kareem Anderson's presence at the bar and subsequent shooting, are included in **Exhibit 11**.  We request that this Court take judicial notice of the reports, which the Government provided to defense counsel, pursuant to Fed. R. Evid. 201(b)(2).

to police the next day and follow-up statements days later.  *See* **Exhibit 11** at 4.

*Alternatively*, an eyewitness[25] told police detectives that he had called Snow the night of the shooting, because he needed a few dollars, and Snow told him to meet them at Brooklyn Nights.  *Id.* at 6.  When the eyewitness arrived at the bar, he "hung out for a bit" with Snow and "a guy with dreadlocks," and then the three of them "got into a dark colored vehicle, driven by an unknown Latino man."  *Id.* (NOTE:  Kristian Cruz is and appears Latino.  *See* **Affirmation** at ¶ 70.)

When the car stopped near a city shelter where the eyewitness was staying, he, Snow and "the dread guy" got out of the car, but the Latino driver stayed inside. When he (the eyewitness) turned to say goodbye to his friend Snow, he heard a loud bang and took off running.  He did not see who shot Snow, but it was only the three of them on the corner, and the Latino driver in the car.  *See* **Exhibit 11** at 6.

The night that Snow was shot, Kristian Cruz drove Mr. Young to Cruz's house in the Poconos.  They stayed there for a few days until Cruz's aunt called to say that police were at the apartment looking to arrest him.  Cruz told Mr. Young it was time to return to New York, and he drove them to his child's mother's apartment in Brooklyn, on Nostrand Avenue a couple of blocks from Bedford Place where Snow had been shot days earlier.  *See* **Affirmation** at ¶¶ 72-73.

---

[25]  The eyewitness is named in the police reports, *compare* **Exhibit 11** at 3 (lines 36-37) with *id.* at 5-6.

On January 23, 2018, four days after the shooting, Kristian Cruz was arrested for his gang activity and released on bond. *See* No. 18-cr-249 Dkt. 1 (and related docket sheet entries). That same day, police activated an investigation into Aaron Young as a possible suspect in the shooting. *See* **Exhibit 11** at 2 (lines 23-25).

On June 15, 2018, police sought to interview Mr. Young and, at the same time, they collected a cigarette butt from him and sent it for DNA analysis. *See id.* at 7-9. On July 30, the lab results came back and Aaron Young was excluded as a contributor to DNA found on the "front strap/back strap/side grips" of the questioned evidence. *See id.* at 10-11. Then, on September 18, 2018, police determined that there was "no probative evidence" in the records they had subpoenaed for Mr. Young's cell phone, for calls around the time of the shooting. *See id.* at 3 (line 39), 12-14. They closed the entire investigation into the shooting that same day. *Id.* at 15.

This is not intended as an "innocence" argument, but to show that Mr. Young was not the mastermind of the shooting. According to cross-examination testimony and police reports, Kristian Cruz involved Mr. Young in his (Cruz's) own revenge plot against Snow – it was not the other way around, Mr. Young did not call and lure Snow. All of which makes sense in light of Mr. Young's mental retardation and Cruz's superior intelligence. According to the prosecutor at Cruz's sentencing, he "is an incredibly smart person. He is an incredibly entrepreneurial person. He's a

very creative thinker and an adaptable person"; and according to Cruz's attorney, he is "really savvy, really creative." Dkt. 37 ("Cruz Sent'g"), at 22, 33. Cruz lured Snow and set him up.

Cruz was the predator here, and both Aaron Young (malleable and retarded) and Snow (a threat) were his prey. In this instance, it just happened to be Mr. Young he set up for the fall; it could as easily have been reversed, had Cruz learned that Mr. Young planned to kidnap him. To Cruz, his gang associates were no more than fungible business assets to rid himself of rivals and competition.

Nor was this the first time that Cruz had used others to carry out his murderous schemes. At his sentencing, a contrite Cruz told this Court: "I understand everything I've done was dangerous and inconsiderate of other people, *but it wasn't intentional. I never intentionally meant to hurt anybody.*" No. 18-cr-249, Dkt. 37 at 40 (italics added). But at the trial of his co-conspirators Mack and Ellis, Cruz admitted to many *intentional* acts of violence: shooting someone (Dkt. 346 at 913); ordering someone to murder his gangmate Mack over a drug debt (Dkt. 351 at 1552); directing others to chase and shoot his gangmate Jordan over an outstanding debt (Dkt. 346 at 952-53); and having Jones shoot people for him in a murder-for-hire-like scheme: "I helped [Nine-Trey godfather Jamel Jones] make money and he would go out and shoot people for me" (Dkt. 346 at 873).

When it suited his purposes – when testifying *at the trial* of co-conspirators to earn a reduced sentence – Cruz admitted to being on many occasions *a very violent and vengeful drug-trafficker*.  When it did not suit his purposes – when making a statement of contrition *at his own sentencing* – Cruz denied ever intentionally meaning to hurt anyone.  Kristian Cruz was the sociopath, not Aaron Young.  But the Government allowed this Court to believe otherwise, to Mr. Young's grave detriment.

After the trial of Mr. Young's co-defendants Mack and Ellis, this Court instructed the Government prosecutors to inform all defense counsel of any information elicited at trial that might benefit their clients at sentencing.  *See* Dkt. 364 ("Tr. of Co-Def. Jones Sent'g") at 21-22.  However, the Government did not remember to tell Mr. Young's attorney about Cruz's testimony regarding the Snow affair – *how it contradicted the information that he (Cruz) previously told the Government and which found its way into Mr. Young's PSR* – and Mr. Young's attorney did not know differently.

Thus, when it came time for Mr. Young's sentencing (two months after his co-defendants' trial), his attorney did not challenge the Government and the PSR's characterization of Mr. Young's role as mastermind and sole participant in the retaliatory shooting of Snow outside of a bar.  Nor did he challenge erroneous facts in the PSR, most notably the location of the shooting, which police reports

documented far from the bar and not in an alleyway alongside as the PSR had it, but rather near Cruz's baby's mother's apartment.  And thus, this Court was left to rely on Kristian Cruz's and the Government's (and, by extension, the PSR's) portrayal of Mr. Young as a conniving, stone-cold assassin, who invited Snow to a bar and then dragged him into a nearby alleyway and barely missed killing his prey, thereby deserving the highest sentence of all the Nine Trey gangsters – which this Court gave him.  Following *Brooker*, when considering anew the § 3553(a) factors, this Court may and should now take into account the significant change to the truth about the offense for which Mr. Young was charged and sentenced.

This Court imposed a sentence of time-served plus one week for Kristian Cruz, finding that his substantial cooperation against virtually the entire Nine Trey group was a sign that his four years of "deeply serious" offenses, running "overwhelming" quantities of drugs through the gang – and "endanger[ing] the public" – were behind him and the likelihood of his returning to crime was "slim." No. 18-cr-249, Dkt. 37 ("Cruz Sent'g Tr."), at 43, 44, 46, 50-51.

The Court subsequently granted compassionate release to Daniel Hernandez, the other cooperating co-conspirator, persuaded that "Mr. Hernandez having been prosecuted, pled guilty, *and publicly cooperated against members of the gang*, the Nine Trey Gangsta Bloods, in concert with whom his violent acts were committed –

no longer will present a meaningful danger to the community if at liberty." Dkt. 451 at 7 (italics added).

To get to the heart of the matter in this motion, *the question is whether Aaron Young*, 38 years old at the time of this *his first felony arrest*, a retarded malleable man *without any history of violence*, who was manipulated by Kristian Cruz into involvement in the shooting of someone he was told was going to kidnap Cruz and kill his childhood friend Jones, *is any more likely to recidivate than is Kristian Cruz*, who at 17 years old left behind his upper-middle-class lifestyle in Manhattan to start up a fentanyl-importation business, which he brought to Nine Trey leaders convincing them to allow him to run their heroin distribution racket, *and* who waited one month until his rival Snow's January birthday to lure him to a bar intending his death; <u>and</u> *whether Mr. Young is any more likely to recidivate than is Daniel Hernandez*, a "violent," "destructive," "reckless" man, who participated in shootings and other acts of violence with the Nine Treys on eight known occasions, and who filmed and distributed a video of two grown men raping a 13-year-old girl. We believe not.

Not one iota of violence exists in Mr. Young's life up to the instant offense – except for the violent physical and sexual abuse perpetrated *upon him* as a child by relatives. His involvement in the shooting of Snow, instigated by another, provoked as it was through guile and deception, *was an aberration that will never be repeated*.

That Mr. Young could *not* also demonstrate to this Court *through cooperation* that he, like Cruz and Hernandez, was redeemable and ready for release – no future threat to the public – was *a consequence of his being of no-consequence* to the Nine Treys, with nothing substantial to offer the Government.  His lack of substantial assistance should not now bar him from compassionate release.

To me, the one to fear going forward is Kristian Cruz.  To me, Cruz defines what it is to be a sociopath:  **a total disregard for the lives of others**, for example, selling to his distributors heroin mixed with the extremely potent drug fentanyl, without telling them, thereby risking the lives of an untold number of users (Dkt. 348 "Cruz trial testimony" at 1239), and firing guns at people making a music video causing them to run for their lives (No. 18-cr-249, Dkt. 18 "Cruz Arraignment," at 15); **violence from a young age**, in 2012 for example, at age 16, he joined a gang and committed armed robbery (Dkt. 346 "Cruz Trial Testimony" at 856; No. 18-cr-249, Dkt. 37 "Cruz Sent'g Tr" at 31-32, 45); **sophisticated criminality from a young age**, at 11 he started selling drugs, at 16 he started selling heroin, at age 17 he began importing heroin and fentanyl analogue from China, and by 20 he had insinuated himself into the Nine Treys and taken control of their drug-distribution racket (No. 18-cr-249, Dkt. 37 at 15, 32; No. 18-cr-384, Dkt. 346 "Cruz Trial Testimony" at 858, 863, and Dkt. 364 "Jones Sent'g Tr" at 35,); **manipulative**, persuading others to commit criminal and often violent acts for him, like having

Jones go out and shoot people for him, and getting his mother to sign for international shipments of fentanyl, and persuading his doorman to receive money for him (Dkt. 346 at 873-74; Dkt. 348 at 1205); **deceitful**, using the bank account of the wealthy uncle with whom he lived to wire funds overseas to build his multi-million-dollar international narcotics operation, and supplying members of his gang with heroin cut with fentanyl but telling them it was heroin (Dkt. 346 at 853, 857-858; Dkt. 348 at 1202-04, 1211-12); and **"incredibly smart," "incredibly entrepreneurial," and "likeable"** (No. 18-cr-249, Dkt. 37 "Cruz Sent'g Tr" at 22). Further, Kristian Cruz is young (24 at the time of sentencing, *id.* at 32) and healthy and male, the cohort most likely to recidivate.

*If Cruz, a one-time sociopath who instigated violence and preyed on the less fortunate and retarded is redeemable and ready for release, then Mr. Young too is ready for release. If Hernandez, a violent man who used his cell phone to video a child being raped, instead of using it to call the police* <u>*to save her*</u>*, is redeemable and ready for release, then Mr. Young too is ready for release, his life worthy of saving from the ravages of poorly controlled diabetes, from the heightened risk of contracting COVID, and from the BOP's health system that is failing him.*

In *United States v. Benjamin*, this Court found that the defendant presented "a relatively minimal 'danger to the safety of any other person or to the community'," despite his "engage[ment] in violent acts as a member of the 18 Park gang." *United*

*States v. Benjamin*, No. 15-cr-445 (PAE), Dkt. 1144 at 6 (S.D.N.Y. Sept. 15, 2020). In granting compassionate release, the Court reasoned that Benjamin's record "does not reflect an inclination to commit violent crimes outside of the 18 Park context," and that the Government's prosecution of the gang and its leaders had "substantially dismantled" the gang. *Id.*; *see also United States v. Ciprian*, No. 11-cr-1032 (PAE), Dkt. 2581 (S.D.N.Y. Feb. 1, 2021) (granting compassionate release to a high-ranking member of the Bronx Trinitarios Gang ("BTG") sentenced to ten years, who engaged in violent and reckless acts, finding that defendant's record "does not reflect an inclination to commit violent crimes outside the BTG.").

Mr. Young's record does not reflect an inclination to commit violent crimes *outside of the Nine Trey context* (see PSR ¶¶ 97-106), and even within the gang he was not inclined to commit violent crimes, never joining the others in any of their marauding sprees of violence perpetrated on the public. He was involved in a single aberrant act of violence in 38 years – which he himself did not instigate – inside the context of a gang that the Government has substantially dismantled. The public does not have anything to fear from Aaron Young, who has been completely deterred from ever again committing a crime, and whose medical condition inhibits his mobility.

### 4. <u>The Sentence Imposed Is Not Needed to Provide Mr. Young with Needed Medical Care or Other Prison Services (§ 3553(a)(2)(D))</u>

The need to provide for Mr. Young's medical care will not be met by continued confinement.  The BOP has failed Mr. Young in virtually every aspect of safe, proper, appropriate, and timely medical care.  A reduced sentence, enabling him to take protective measures under home detention, will provide Mr. Young with access to the most effective manner of medical treatment appropriate to his individual medical conditions in light of the ongoing COVID-19 pandemic.  *See* § 3553(a)(2)(D).  Mr. Young will get appropriate medical care and a greater degree of relief from his current symptoms, which include:  intermittent dizziness, blurry vision and headaches; swelling in his knees and hands; arthritis in his hips and knees; chest and neck pain; pressure pain in his lower back and kidneys; cracked skin and foot fungus; weight gain; tooth pain and gum disease; and depression and anxiety. *See* **Affirmation** at ¶ 50.

Mr. Young's sister has offered to house Mr. Young at her two-bedroom Brooklyn apartment, to help him find a physician to oversee his medical care, and to monitor his medication intake.  Not only does she have a stable living situation and employment – she has been working for the New York City Department of Education for 20 years – but she has experience caring for her other brother, who has been a paraplegic since a car accident ten years ago.  *See* **Exhibit 12** ("Letter of Mr. Young's Sister").

5.  <u>The Court Shall Consider the Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))</u>

The 20-year sentence imposed on Mr. Young, driven as it was by the base offense level for fentanyl-analogue, creates an unwarranted disparity with the sentences of his co-defendants (particularly Aljermiah Mack), which this Court should consider under § 3553(a)(6), regardless of whether it also finds the disparity to constitute an independent compelling and extraordinary reason to reduce Mr. Young's sentence.  *See, e.g.*, *Trenkler*, 537 F. Supp. 3d at 105 (stating that even where sentencing disparity "does not amount to extraordinary and compelling circumstances, it can and should be considered when determining the appropriate level of sentence reduction, in the event a reduction is appropriate under § 3582(c)(1)(A).").  Both were charged with the same narcotics offense conduct, both committed violent acts (Mack committed many more, including shooting people, and was at Criminal History Category VI), but Mr. Young pled guilty and accepted responsibility and demonstrated remorse.  Mack received a 204-month sentence; Mr. Young received a 240-month sentence.

6.  <u>Section § 3553(a) Factors Favor Immediate Release</u>

In sum and in total, consideration of the 18 U.S.C. § 3553(a) factors favors the expedition of Mr. Young's release date from prison, to serve a protracted term of home confinement as a condition of supervised release.  Mr. Young will be subject to close monitoring by the Probation Department, consistent with the protocols for

such monitoring in place during the pandemic.  These restrictions will advance various interests recognized by § 3553(a), including to assure just punishment, enhance specific deterrence, protect the public, and to assist in Mr. Young's reintegration into society.  On the other hand, continuing to expose Mr. Young to grave risks to his health would not serve the interests of promoting respect for the law or providing just punishment.

## CONCLUSION

The assembled considerations provide "extraordinary and compelling reasons," *Brooker*, 976 F.3d at 238, justifying Mr. Young's early release.  This conclusion is compelled by the heightened vulnerability to COVID-19 that Mr. Young faces due to his medical conditions; the unexpectedly punishing quality of the 41 months that Mr. Young has spent in custody, 20 of them in MCC and MDC, and 26 of them during the unprecedented pandemic; and the sound reasons to believe that Mr. Young, if on supervised release subject to a strict condition of home confinement, will abide by the law.  His case accords with others during this extraordinary time in which this Court has granted compassionate release to prisoners with demonstrated heightened vulnerability to COVID-19.

Accordingly, we ask this Court to grant Mr. Young's motion for compassionate release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).


Respectfully submitted,

Date:  June 2, 2022                   */s/ Alessandra DeBlasio*
                                      ALESSANDRA DEBLASIO, ESQ.
                                      Attorney At Law
                                      299 Broadway, Suite 1803
                                      New York, NY  10007
                                      ad@adeblasiolaw.com
                                      Tel. (212) 321-7084
                                      Fax (973) 689-2765
                                      *Attorney for Aaron Young*

## CERTIFICATE OF SERVICE

I, Alessandra DeBlasio, Esquire, certify that I served on this date a copy of

the Motion for Compassionate Relief, the Affirmation, the Memo of Law in

Support of the Motion, as well as all 12 Exhibits by Electronic Case Filing to:


Michael D. Longyear, Esquire
Assistant United States Attorney
*michael.longyear@usdoj.gov*


Date:  June 2, 2022                    */s/ Alessandra DeBlasio*
                                        ALESSANDRA DEBLASIO, ESQ.